1                    UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA
2
                                   )
3    UNITED STATES OF AMERICA,      )   Case Nos. 20-cr-417-5 & 6
                                    )
4                   Plaintiff,      )   Philadelphia, PA
                                    )   February 26, 2025
5    vs.                            )
                                    )   JAMES A. BYRNE U.S.
6    KELVIN JIMENEZ,                )   COURTHOUSE
     DOMINIQUE PARKER,              )
7                                   )
                    Defendants.     )
8
              TRANSCRIPT OF CRIMINAL JURY TRIAL - DAY 3
9               BEFORE THE HONORABLE JUAN R. SANCHEZ
                 UNITED STATES DISTRICT COURT JUDGE
10
     APPEARANCES:
11
     For the Government:     ASHLEY MARTIN, AUSA
12                           LAUREN STRAM, AUSA
                             CHRISTOPHER DIVINY, AUSA
13                           U.S. ATTORNEY'S OFFICE
                             615 Chestnut Street - Suite 1250
14                           Philadelphia, PA 19106

15   For the Defendant:     THOMAS FITZPATRICK, ESQ.
     Kelvin Jimenez         MINCEY, FITZPATRICK, ROSS, LLC
16                          One Liberty Place
                            1650 Market Street - Suite 3600
17                          Philadelphia, PA 19103

18   For the Defendant:     MICHAEL PARKINSON, ESQ.
     Dominique Parker       PT&L, LLC
19                          1315 Walnut Street - Suite 1605
                            Philadelphia, PA 19107
20
     ESR OPERATOR:           JIMMY CRUZ
21
     Transcription Service:  HUNT REPORTING COMPANY
22                           15210 Dino Drive
                             Suite E
23                           Burtonsville, MD 20866
                             410-766-HUNT (4868)
24                           1-800-950-DEPO (3376)

25   Proceedings recorded by electronic sound recording.  Transcript
     produced by computer-aided transcription service.

1                                    I N D E X

2
OPENING STATEMENTS:                                              PAGE
3      For the Government                                          64
       For the Defendants                                         84
4
                                                                VOIR
5      WITNESSES:            DIRECT  CROSS  REDIRECT  RECROSS  DIRE
       For the Government:
6      James McKinnies          101      111,112,112
       Ryan Rooney              114
7
       EXHIBITS:  DESCRIPTION                              ID.   EVID.
8      For the Government:
       G-50        Presentation                                 106
9      G-50-104    PowerPoint                                   136
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              THE CLERK:  All rise.  United States District Court

 2    for the Eastern District of Pennsylvania is now in session.

 3    The Honorable Juan R. Sanchez presiding.

 4              THE COURT:  Good morning, everyone.

 5              IN UNISON:  Good morning, Your Honor.

 6              THE COURT:  All right.  You may be seated.

 7              MR. PARKINSON:  Thank you.

 8       (Pause)

 9              THE COURT:  Okay.  So we are resuming the trial.  The

10    United States of America v. Kelvin Jimenez and Dominique

11    Parker.  Criminal Number 20-417.  The Court report recognizes

12    the Assistant United States Attorneys Ashley Martin.

13              MS. MARTIN:  Good morning, Your Honor.

14              THE COURT:  Lauren Stram.

15              MS. STRAM:  Good morning, Your Honor.

16              THE COURT:  And Mr. Diviny.

17              MR. DIVINY:  Good morning, Your Honor.

18              THE COURT:  Court also recognizes defense counsel.

19    Mr.  Parkinson.

20              MR. PARKINSON:  Good morning, Your Honor.

21              THE COURT:  And Mr. Fitzpatrick.

22              MR. FITZPATRICK:  Good morning, Your Honor.

23              THE COURT:  Present are also defendants Mr. Dominique

24    Parker and --

25              THE DEFENDANT PARKER:  Good morning, Your Honor.

1        THE COURT:  Good morning.  And Mr. Kelvin Jiminez.

2        THE DEFENDANT JIMINEZ:  Good morning, Your Honor.

3        THE COURT:  Good morning.  So we are going to continue

4   selection of the alternates.  I think we have a question as to

5   whether it's going to be one -- selecting one, two, or three

6   depending on how the issues that were raised yesterday are

7   resolved.

8        So we're going to get a panel that will begin at 81.

9   And I think it's a total of about twenty-five prospective

10  jurors beginning with 81.  And I think it's a little bit over

11  one hundred, so that will be a continuation of the jury

12  selection.

13       I have to decide how many strikes, and that will

14  depend on the number of jurors that we have to select -- the

15  alternates that we have to select.  Right now, we excused seat

16  number 7.  The Juror No. 7 has been excused, so we know that we

17  have to select that minimum one.

18       I think yesterday there were issues raised with Juror

19  No. 6, and that is the juror -- I think we do have the notes.

20       Do you have the notes?  The notes that we got from the

21  jurors yesterday?  There was a juror that indicated that her

22  she indicated that her sister-in-law is an ADA from Montgomery

23  County and that she did not raise it or say anything with law

24  enforcement question because she wasn't sure that this is law

25  enforcement, and she wanted to disclose that in an abundance of

1    caution.  And as I told you yesterday, I talked to the juror,

2    and I placed my discussion with the juror on the record -- on

3    the record because despite that, she would have been able to be

4    a fair and impartial juror in this case.

5          And then we also put on the record yesterday, but we

6    also got a communication with Juror No. 10 with regards to the

7    fact that her mother is in rehab.  She's eighty-three years

8    old.  She's in a rehab right now, and the juror does not know

9    how long she's going to be or when she's going to be released,

10   which could be a week or two weeks.  It could be longer.  But

11   the point being that she is the caretaker of an

12   eighty-three-year-old mother.  That we discussed yesterday.

13         So I think the other issues with the other jurors were

14   not issues.  I think those issues could be accommodated.  But

15   with regards to Juror No. 6, is the Government -- I mean, you

16   don't want to create issues for appeal --

17         MR. DIVINY:  Well, Judge, I --

18         THE COURT:  -- even though even though I think that

19   the law is pretty clear that unless they could show actual

20   prejudice.

21         MR. DIVINY:  We talked yesterday, Judge, because

22   remember, you did ask us for some law.

23         THE COURT:  Right.

24         MR. DIVINY:  After you left the bench, Mr. Fitzpatrick

25   said to us listen, you don't need to do any research.  We're

1    going to withdraw that motion regarding Juror No. 6.

2                MR. FITZPATRICK:  That's correct --

3                THE COURT:  All right.

4                MR. FITZPATRICK:  -- Your Honor.

5                THE COURT:  So let's put that on the record.

6                Attorney Fitzpatrick?

7                MR. FITZPATRICK:  Yes, Your Honor?

8                THE COURT:  So did you raise that issue with your

9    client?  Because I believe your client raised it with you and

10   did you discuss it with your client and does your client

11   consent to withdrawing your objection to sitting Juror No. 6?

12               MR. FITZPATRICK:  Yes, Your Honor.  We had a

13   discussion concerning the concerns of Juror No. 6 as well as

14   Juror No. 10 and the position that that would put the Court in

15   in terms of evaluating those jurors.  My client has withdrawn

16   his challenge to Juror No. 6 being seated on this jury.

17               THE COURT:  Right.  Okay.

18               Mr. Jimenez, I think I put you on the oath yesterday.

19   I'm going put you on the oath again right now, just for the

20   limited purpose of acknowledging your discussion on that issue

21   and your agreement and consent that you withdraw the objection

22   to Juror No. 6.

23               THE CLERK:  Would you please raise your right hand?

24                    DEFENDANT, KELVIN JIMENEZ, SWORN

25

1          THE CLERK:  Thank you.  Please state your name for the

2    record.

3          THE DEFENDANT JIMINEZ:  Kelvin Jimenez.

4          THE COURT:  Okay.  Thank you.  Thank you, Mr. Jimenez.

5    So Mr. Jimenez, you heard yesterday the issue that you raised

6    with regards to Juror No. 6, and you have had an opportunity to

7    talk to your lawyer after your lawyer talked to the Government?

8          THE DEFENDANT JIMINEZ:  Yes.

9          THE COURT:  And you consent to withdrawing your

10   objection to sitting Juror No. 6?

11         THE DEFENDANT JIMINEZ:  Yes, I do.

12         THE COURT:  And you're satisfied that you understand

13   the implications of all of that, right?

14         THE DEFENDANT JIMINEZ:  Yes, Your Honor.

15         THE COURT:  All right.  Thank you very much.  Is there

16   anything else I need to ask Mr. --

17         MR. FITZPATRICK:  No, I don't think so.  I don't think

18   Mr. Parker or Mr. Parkinson had joined that, so I don't think

19   there's any necessity of evaluating that.

20         THE COURT:  Right.

21         MR. DIVINY:  I mean, Judge, again, just to be clear

22   for the record, I have had an opportunity to speak with Mr.

23   Parker and we're in the same situation.  We agree with that.

24         THE COURT:  All right.  With Mr. Parker, in an

25   abundance of caution, I'm going to swear you in as well.

1              Jimmy, could you swear him in?

2              THE CLERK:  Yes.  Would you please raise your right

3    hand?

4                    DEFENDANT, DOMINIQUE PARKER, SWORN

5              THE CLERK:  Please state your name for the record.

6              THE DEFENDANT PARKER:  Dominique Parker.

7              THE CLERK:  Thank you.

8              THE COURT:  Mr. Parker, on this limited issue of

9    sitting Juror No. 6, you consent to allowing Juror No. 6 to sit

10   as the trial juror in this case?

11             THE DEFENDANT PARKER:  Yes.

12             THE COURT:  All right.  I did talk to your lawyer

13   about it, or had a brief opportunity to talk to your lawyer

14   about it.

15             THE DEFENDANT PARKER:  Yes.

16             THE COURT:  And -- okay.  I don't think I need to ask

17   anything further.  Thank you very much.  So with that, now,

18   you're not pressing or raising any issues --

19             MR. DIVINY:  No.

20             THE COURT:  -- or asking me with regards to Juror No.

21   10.  Although I think we're going to have problems with Juror

22   No. 10, to be honest, because --

23             MR. DIVINY:  Yeah.

24             THE COURT:  -- the eighty-three-year-old -- she did

25   not disclose the eighty-three-year-old mother.  And we don't

 1   know when it's going to be released.  And I don't know that

 2   each one of the -- each one of you want to have a juror who's

 3   going to be worrying about a eighty-three-year-old mom and

 4   taking care of her, and how to make arrangements.  So I could

 5   have a further colloquy with her to see what the arrangements

 6   are and to make sure that whether she's released in two weeks

 7   or three weeks or four weeks, she can fulfill her obligation to

 8   this case, which is expected at least five weeks.

 9            MR. DIVINY:  Yeah, I agree with you, Judge.  I think

10   if we look ahead, I don't know how we avoid this sort of train

11   wreck coming.  But you're right that the premise for us

12   revisiting this was, of course, the trying to use strikes that

13   had already been used -- peremptory strikes.

14            So you're right that the fact that Mr. Fitzpatrick has

15   withdrawn his objection in seeking to use a -- or getting

16   return to strike for Juror No. 6 would undercut our premise

17   regarding that.  I think it -- for the record, I do think that

18   it's consistent with our lack of any racial animus in use of

19   strikes that we didn't have this information before and now we

20   do, so.

21            THE COURT:  Right.  But you're not pressing --

22            MR. DIVINY:  No.

23            THE COURT:  Pressing --

24            MR. DIVINY:   No, Judge.  It is what it is.  She's on

25   there.  I think we think we just have to deal with it as --

```
 1              THE COURT:  Right.
 2              MR. DIVINY:  -- is it going to be a problem with the
 3    hardship and that's that.
 4              THE COURT:  Right.  Which is what I instructed the
 5    juror, that we'll cross that bridge when we get to it.  It's
 6    possible that she could serve her time.
 7              MR. DIVINY:  Can I ask a question, Judge?
 8              THE COURT:  It's possible that she may have issues,
 9    but we could discuss them at that time if we need to substitute
10    out --
11              MR. DIVINY:  Yeah --
12              THE COURT:  -- that juror at that time.  We don't need
13    to do that now.
14              MR. DIVINY:  Yeah, I agree.  I mean, I guess I just
15    would -- at that time is the part that I would be curious
16    about.  Like, does she -- and I don't know what she said to
17    Your Honor, but like, does she -- when she gets more
18    information, she knows to come to you?
19              THE COURT:  Yes.  She --
20              MR. DIVINY:  Okay.  All right.
21              THE COURT:  I think I -- I did finally mention that.
22    I asked her well, we'll cross that bridge when we get to it.
23    As soon as you know when your mother is --
24              MR. DIVINY:  Okay.
25              THE COURT:  -- going to be released.  And I asked -- I
```

1    anticipate the hospital will give you a time and date for your

2    mother's release.  So as soon as you release, you let me know

3    so that I could deal with the issue then.

4          MR. DIVINY:  I do think it's prudent to maybe plan

5    ahead, like if we're deciding how many we're picking, that she

6    may not work out.  So I do think it's probably wise to have

7    another alternate with the anticipation of potentially a

8    problem.

9          THE COURT:  But we can't carry more than eighteen, can

10   we?

11         MR. DIVINY:  No -- no, I agree.  Yeah --

12         THE COURT:  Right now we have -- right now we have

13   seventeen.

14         MR. DIVINY:  Yeah, I know.  Okay.  We're going to deal

15   with what we deal with.  All right.

16         THE COURT:  And so we have eighteen.  If we lose one,

17   we lose one.

18         MR. DIVINY:  Okay.

19         THE COURT:  We'll have to substitute --

20         MR. DIVINY:  That's fine.

21         THE COURT:  -- out for her.  But we don't know when

22   we're going to lose her.

23         MR. DIVINY:  Right.

24         THE COURT:  I think she's going to hang in with her

25   with us until such time as she has better information from the

1    hospital about her eighty-three-year-old mom's release, which

2    we will discuss with the Government as well as with counsel.

3              MR. DIVINY:  Sure.

4              THE COURT:  But Counsel, you are aware that that is an

5    issue with --

6              MR. DIVINY:  Yes --

7              THE COURT:  -- the juror?

8              MR. DIVINY:  -- of course.  Yes.

9              THE COURT:  She didn't -- I think that was the only

10    issue she raised.  So --

11              MR. FITZPATRICK:  Judge, can I just ask, too.  Like,

12    did Your Honor inquire like, is she okay?  Like, does she -- I

13    mean, I know normally you would follow-up and say --

14              THE COURT:  I did a very limited -- I didn't want to

15    exceed -- I didn't want to do too much.

16              MR. FITZPATRICK:  Yeah.

17              THE COURT:  All I did is I responded to her email.  I

18    questioned her by email.

19              MR. DIVINY:  I mean, a lot of times, Judge, if that

20    had happened in the flow of normal voir dire, we probably would

21    have asked given that that's something that's pending, is that

22    something that you think is going to be on your mind that might

23    be a distraction to you?  That's --

24              THE COURT:  Well, I did not --

25              MR. DIVINY:  Okay.

```
 1              THE COURT:  -- go that -- I didn't go that deep
 2   because again, she just -- I didn't want to do a colloquy, but
 3   I will offer counsel the opportunity to do that now.  We could
 4   do that now to avoid a problem or a train wreck down the line.
 5              MR. PARKINSON:  Judge, I think she answered your
 6   question.  I mean --
 7              THE COURT:  Right.
 8              MR. PARKINSON:  -- it was all said and done and it's
 9   something where we're going to have four alternates when it's
10   all said and done after we pick today.  And she said we don't
11   even know about that at this point, so I don't think any extra
12   questions.  She answered your questions.  She said this might
13   be an issue down the line and we'll address it then.  I don't
14   know why we need to try and dig up anything else anymore.
15              THE COURT:  Okay.
16              MR. PARKINSON:  Well, the only reason I would do it,
17   Judge.
18              THE COURT:  Hold on.  Let me get --
19              MR. PARKINSON:  Yes.
20              THE COURT:  Get in his position.  Mr. Fitzpatrick?
21              MR. FITZPATRICK:  I agree with Mr. Parkinson, Your
22   Honor.  We have alternates.  If something happens, then we can
23   utilize one of the alternates, but I think it may be less
24   beneficial to start to question this juror and bring those
25   issues to the surface.
```

1          THE COURT:  I will.

2          MR. DIVINY:  Just two things.

3          THE COURT:  Go ahead.

4          MR. DIVINY:  Just two things.  If she is distracted,

5   that's really not good as a juror, even if it does work out

6   ultimately.  But secondly, one of the things to consider is if

7   she -- if we were to ask her that and she says, yeah, this is

8   really on my mind.  I think I might have trouble concentrating.

9   Does it really make sense to make this person potentially stay

10  for a couple of weeks and then have to leave anyway?  But

11  that's Your Honor's decision.  I mean --

12         THE COURT:  Right.

13         MR. DIVINY:  -- that's not my decision.  It's your

14  decision.

15         THE COURT:  No, no.  Well, I'm going to give these

16  jurors preliminary instructions regarding the responsibility to

17  pay close attention to the testimony.  And I'm pretty sure that

18  if she has any issue, she will raise them.  These jurors are

19  not shy about sending me notes.  So I'm not going to highlight

20  any further this issue.  I think counsel has a point.  We'll

21  deal with it when, and if, we have a problem.

22         MR. DIVINY:  Judge, I just want to --

23         THE COURT:  So right now, we have that one juror to

24  pick, so for eighteen.  We have seventeen.  Oh.  The other one

25  is the one that had the accident.  I don't know whether he's

1  going to be able to continue, but he asked for instructions, as

2  I told you yesterday.  So I expect that he's here.  If he's not

3  here, then we'll pick two.

4          MR. DIVINY:  When will we know that?

5          THE COURT:  Well, he was instructed to call us or

6  we'll know pretty soon.

7          MR. DIVINY:  Oh, good.  Okay.

8          THE COURT:  He was instructed to call us if he had

9  any --

10          MR. DIVINY:  That's fine.

11          THE COURT:  -- issues --

12          MR. DIVINY:  Okay.

13          THE COURT:  -- about coming in, because --

14          MR. DIVINY:  That's all I was going to ask.

15          THE COURT:  -- as I said to everybody, we instructed

16  him to be here at 11.  We also indicated if he has any medical

17  issues or continuing medical problems to let us know

18  immediately.

19          MR. DIVINY:  Okay.  Right.

20          THE COURT:  So --

21          MR. DIVINY:  That'll change by the day.

22          THE COURT:  Right.

23          THE COURT:  So again, we don't have to decide how many

24  until later on.

25          MR. DIVINY:  Okay.

1          THE COURT:  See where we are at the end of the

2     process, just before you select and see if he comes.  Or we

3     could contact him to find out whether he's on his way.  But we

4     could do that a little bit later.

5          MR. DIVINY:  And either way, if it's one or two, we

6     still only get one strike each is my understanding.

7          THE COURT:  Right.  Right.

8          MR. DIVINY:  Under each one, anyway.

9          THE COURT:  So I'm bringing a lot of people for one

10    strike each.  So it will be either one to two.  I think I have

11    discretion to give you a little bit more --

12          MR. DIVINY:  Okay.

13          THE COURT:  -- or two to four to give you a little bit

14    more control.

15          MR. DIVINY:  Okay.

16          THE COURT:  And then depending on the hardships, I'll

17    see -- I think I'll be a little bit more liberal on the

18    hardships.

19          MR. DIVINY:  That's fine, Judge.

20          THE COURT:  So I think I have the discretion to

21    increase it to two to four.

22          MR. DIVINY:  You absolutely do under Rule 24, Your

23    Honor.

24          THE COURT:  Right.  So --

25          MR. DIVINY:  I don't think there's any objection from

1    the --

2              THE COURT:  Yeah.  Two to four I think is not out.  So

3    it will be you pick, Parker one -- no.  Jimenez is under --

4    Jimenez one, Parker one, you pick two, then it will be Jimenez

5    two, and Parker two.  So they total four and you total two.

6    Got it?

7              MR. DIVINY:  Yes, Your Honor.

8              THE COURT:  All right.  Please, please, please, please

9    when you see the juries list that you have to flip back and

10   forth, at the bottom -- at the bottom, we have some suggestions

11   and as to how to do your strikes.  And so I will deal with all

12   challenges or costs and hardships.

13             But in terms of your preemptory challenges, use PP for

14   the prosecution.  PP for the prosecution.  PP1 and PP2 and so

15   the like.  For the defense, use PD.  PD, preemptory challenge

16   defendant.  Defendant 1 under indictment and defendant 2.  So

17   it will be PD1/strike 1.  PD2/strike 1.  And it will be easy to

18   read.  And it's consistent with the instructions that we gave

19   you.  Could you do that?

20             MR. DIVINY:  Absolutely, Judge.

21             MR. PARKINSON:  Sure.  Yes, Your Honor.

22             THE COURT:  Could you do that?  You created your own

23   system, but I will appreciate it.  I've been told the jurors

24   should be here between 9:40 and 10.

25             MR. DIVINY:  Okay.

```
 1              THE COURT:  So is there anything else that I need to
 2   discuss or that you want to raise with me before we begin jury
 3   selection?
 4              MS. MARTIN:  Your Honor, this is not urgent or
 5   anything.  I just -- I did realize that I am summoned for jury
 6   duty locally in Philadelphia on March 24th, so I may need a
 7   note from the Court.
 8              THE COURT:  You may need a note from me?
 9              MS. MARTIN:  If Your Honor is inclined to excuse me
10   from that, otherwise, I am summoned.  I would love to serve.  I
11   don't think --
12              THE COURT:  You're attached to this case.
13              MS. MARTIN:  I know, Your Honor.  I just -- I think I
14   may need something from the Court.
15              THE COURT:  Okay.
16              MS. MARTIN:  I'll call this afternoon.
17              THE COURT:  Should I make her beg?
18              MR. DIVINY:  Yes.
19              THE COURT:  I'll be happy to give you a note.  You
20   want to -- we could give it to you at the end of the day.  You
21   need it now?
22              MS. MARTIN:  Thank you.  At the end of the day is fine
23   or any time really?  Thank you.
24              THE COURT:  Yeah.  All right.
25              MR. DIVINY:  Judge, just one other matter, if
```

```
 1    possible.

 2              THE COURT:  Go ahead.

 3              MR. DIVINY:  Just actually more of a housekeeping.

 4    Would it be possible to maybe have another monitor for our IT

 5    person so he can be able to see when the exhibits are going in,

 6    if that would be possible?

 7              THE COURT:  We could ask.  Jimmy?

 8              MR. DIVINY:  We did ask for a monitor, Judge.

 9              THE CLERK:  Is this for 3?  Another monitor for 3?

10              MR. DIVINY:  Yes, yes.

11              THE CLERK:  Oh, we -- this is basically another

12    monitor for them and then I'll -- I'll keep this one here.

13    It's -- it's right now, Your Honor, they can't -- I can't see

14    the exhibits if it stays this way, so I can't track it.  I

15    mean, I can stretch it and see, but I can't see --

16              THE COURT:  All right.  Can we do that?

17              THE CLERK:  I'm sorry.

18              THE COURT:  Did they say no because you asked, or did

19    they say --

20              MR. DIVINY:  Yeah.

21              THE COURT:  -- no because there's nothing?

22              MR. DIVINY:  I couldn't even say it and they told me

23    no, but if I say that you want it.

24              THE COURT:  Well, tell them I want it.

25              MR. DIVINY:  Okay.  Thank you, Your Honor.
```

```
1           THE COURT:  And moving forward, anytime you work for

2  me, you have my authority to ask and demand.  All right?

3           What is this?  Oh.  (Indiscernible).

4           UNIDENTIFIED SPEAKER:  (Indiscernible).

5           THE COURT:  All right.  Oh.  So is it separate?  Okay.

6  No I didn't swear them in.  No.  All right.

7           So let me tell them that this -- could you get him on

8  the phone?  I need to make sure that this is right.

9           THE CLERK:  Okay.

10          THE COURT:  All right.  So I think I was wrong.  I

11 think we're going to get a new panel.  One to twenty-five.

12 It's a new panel; not a continuation of the last panel.  I

13 don't know whether that makes a difference or not.  I don't

14 think it should, but I will talk to Lombardi (ph.).

15          MR. DIVINY:  Yeah.  I thought we said that yesterday

16 we were getting new jurors, right?

17          THE COURT:  Yeah.  Well, there is new jurors, but --

18          MR. DIVINY:  Yeah.

19          THE COURT:  -- how are they going to going to give

20 us --

21          MR. PARKINSON:  (Indiscernible) number 81.

22          THE COURT:  How are they going to be numbered?

23          MR. DIVINY:  Oh, I see what you're saying.

24          THE COURT:  Might be an issue.

25          MR. DIVINY:  So it would be 1 to 25.  Okay.
```

```
1              THE COURT:  Right.  All right.

2              MR. DIVINY:  All right.  All right.

3              THE COURT:  They should be here in about ten minutes.

4              MR. DIVINY:  Okay.

5              THE COURT:  Ten minutes.  They instructed me that they

6    are ready at 9:45, so they should be coming up at 9:45.

7              That means, Jimmy, you're going to have to go get

8    them.  All right?

9              THE CLERK:  Yes.

10             MR. DIVINY:  So we should flip our seats around,

11   Judge?

12             THE COURT:  Yes.  Move your seats around.  And I

13   assume that the waiver which you signed applies to this as

14   well, Attorney Patrick (sic)?

15             MR. FITZPATRICK:  Yes, Your Honor.

16             THE COURT:  Attorney Fitzpatrick.  Attorney Parkinson?

17             MR. PARKINSON:  Yes, Your Honor.

18             THE COURT:  And Attorney Diviny, you don't have an

19   issue with that waiver?

20             MR. DIVINY:  Not at all.

21             THE COURT:  Okay.  Thank you.  So turn your seats

22   around.  I'm just going to make a call, and I'll be right

23   back.

24             THE CLERK:  All rise.

25             (Recess at 9:33 o'clock, a.m.)
```

```
 1              THE COURT:  Very well.  Could you move your chairs?
 2   You could come a little bit more.  Come a little bit closer to
 3   me?  Just bring it closer to me.
 4              THE COURT OFFICER:  Yeah, this will help.
 5              THE COURT:  You could take a seat.  Thank you.  Thank
 6   you very much.
 7              Are they ready for lunch?
 8              THE CLERK:  (Indiscernible).
 9              THE COURT:  I believe they are.
10        (Pause)
11              THE COURT:  So counsel, I'm going to give you -- I
12   give you a seating chart and Alternate No. 1 went to seat
13   number 7 and our last alternate will be seat 18.
14              MR. DIVINY:  Very good, Your Honor.
15              THE COURT:  Okay.  Got it?
16              MR. DIVINY:  Yes.
17              MS. MARTIN:  Thank you, Judge.
18              THE COURT:  And you complete -- you can complete the
19   number.
20              So Ms. Herzog, you've been selected to participate as
21   a member of the trial jury in this case.  The jury is in the
22   jury room.
23              I'm going to ask her to join the jury.  She will be
24   the sixth alternate.
25              And we anticipated that this was going to happen at
```

1    lunch, so I think we brought extra lunch for you.  We took a

2    guess, but if you need anything.  So as soon as the jury has

3    lunch and is finished with lunch, hopefully by 1:30, we will

4    get started.  But right now, you cannot talk to anyone,

5    including the other fellow jurors who are waiting for you in

6    the jury room, about anything.  You could talk to them about

7    things of a personal nature, but do not engage them in anything

8    having to do with this process. although they went through the

9    process earlier in the week.  And discuss with them anything

10   that may be connected to this case in any way, shape, or form.

11          I've been giving instructions that you cannot read

12   anything that might be in the newspapers about this case, watch

13   anything on television about this case, the radio, access

14   information from the internet, use social media to access

15   information out of curiosity to find out about this case,

16   because that would be inappropriate.

17          The information you're going to need to decide this

18   case will be presented to you in the presence of the Court and

19   the lawyers.  It will be highly inappropriate for any juror to

20   supplement their knowledge about this case, this type of case,

21   any issues with this case, the parties in this case from

22   outside sources, like social media, using electronic devices to

23   access social media, through all the social media that we have.

24   Reasons are obvious.  A lot of information in the public domain

25   is totally wrong or misinformation.  But in any event, there's

1    a whole bunch of witnesses who may come before to the trial to

2    testify and sometimes they read, and it will be inappropriate

3    for them to also read things that might be in the social media

4    post by anyone.  So please do not access information from any

5    source outside the courtroom.  And anything that you learn that

6    is happening in this courtroom cannot be shared with anybody

7    else.  I will give the jury instructions at every break and at

8    the end of the trial.  But all my instructions taken together

9    will be the law that you need you need to follow.  So it will

10   be highly inappropriate for you to give information to anyone

11   outside the courtroom, as well.

12         Today, when you go back home, you could tell your

13   family that you've been selected, and you could tell how long

14   the case is expected to last, but you should not engage them in

15   any discussion about the case in any way, shape, or form,

16   because somebody's ideas or thoughts might influence your

17   judgment and your judgment should be influenced by nothing

18   other than what you hear in the courtroom from the witnesses,

19   the evidence that will be presented to you, and in the presence

20   of the Court, because the parties need to challenge or vet the

21   information.

22         You can follow those instructions?  I'm going to ask

23   that you join the other fellow jurors.  You will have an

24   opportunity to meet them, but you'll meet them now.  And we

25   have eighteen total jurors to begin the trial.  And we'll begin

1    about 1:30.  Okay?  My deputy Nancy Delisle will take you in.

2              THE COURT OFFICER:  All rise.

3              THE COURT:  Okay.  You may be seated.  All right.  I

4    think, Attorney Stram, you had an issue with covert testimony

5    listening device, some conversation that was recorded.  I don't

6    have any objection.  And nobody filed an objection.  But you

7    want to use this in the openings?

8              MS. STRAM:  Yes.  Your Honor, as --

9              THE COURT:  Go ahead.

10             MS. STRAM:  As I intend to describe it is that there

11   was a covert listening device that captured conversations --

12             THE COURT:  But you're not playing it?

13             MS. STRAM:  No, Your Honor.  I'm not playing it --

14             THE COURT:  Yeah, right.

15             MS. STRAM:  -- but I do intend to describe the nature

16   of that and it would entail that it was taken while they were

17   incarcerated, so --

18             THE COURT:  Yeah.

19             MS. STRAM:  -- I just wanted to alert the Court of

20   that and my intention to do that.  Of course, there's no

21   objection, but given the reference to the custody status, I

22   thought it prudent to bring it to the Court's attention

23   before --

24             THE COURT:  Okay.

25             MS. STRAM:  -- just --

```
 1              THE COURT:  Right.  No, I appreciate you giving me a

 2   heads up.  Is there any way to sanitize it --

 3              MS. MARTIN:  No.

 4              THE COURT:  -- to delete any mention or reference that

 5   it was recorded in prison?

 6              MS. STRAM:  Your Honor, I don't think so.  It's just

 7   the nature of the evidence itself.  I think the testimony in my

 8   opening I could say that it was a recording, but the testimony

 9   will certainly that would tend to elicit will certainly --

10              THE COURT:  Right, but one thing is to mention it

11   broadly in your opening, and the other thing is in your -- once

12   it's out for closing, it's a different argument because in

13   closing, you could probably mention it.  But at least in the

14   opening you don't have to mention that it was while he was at

15   prison, do you?

16              MS. STRAM:  Your Honor, you know, I --

17              THE COURT:  You don't need that.

18              MS. STRAM:  Right.  I could say that it's a recording

19   if it was --

20              THE COURT:  And that they're going to hear it.

21              MS. STRAM:  Right.

22              THE COURT:  They're going to hear his own words.

23   Yeah.

24              MS. STRAM:  Right.

25              THE COURT:  All right.
```

1          MS. STRAM:  So is that what the Court would like me to

2    do?

3          THE COURT:  Yeah.  That's what I would like you to do,

4    just because it's an opening and the opening is not evidence.

5    Of course, the closings are not evidence either, but they would

6    have heard testimony from the witnesses about the statement of

7    where it was recorded while he was in detention because he's

8    still -- what is it?  He's a pre-trial detainee.  He's not a

9    convicted individual yet.  But then it's a little different.

10   Then I think we could -- I don't have to worry about closing.

11         But at least for the opening statements, if you could

12   make no reference to the fact that it was at the Federal

13   Detention Center, just that they're going to hear recordings in

14   his own words from people that he talked to and whatever the

15   statement says.

16         MS. STRAM:  Yes, Your Honor.  Thank you.

17         THE COURT:  Okay.  We could do that, right?

18         MS. STRAM:  Yes.

19         THE COURT:  You don't have an objection to that?

20         MR. FITZPATRICK:  No, Your Honor.  What you said, I

21   think, would be perfect.  I mean, she's mentioned it's a

22   recording.

23         THE COURT:  Right.

24         MR. FITZPATRICK:  But she's not mentioning jail.

25         THE COURT:  Right.  You don't have an objection to

```
1    that?

2             MR. FITZPATRICK:  No, Your Honor.

3             THE COURT:  All right.  Thank you.  I do appreciate

4    it.

5             So Attorney Stram, so we've got about half an hour.

6    My instructions -- you're going to give the opening statement?

7             MS. STRAM:  Yes, Your Honor.

8             THE COURT:  And you are going to be a little -- I'm

9    not going to rush you, but about what, forty-five minutes

10             MS. STRAM:  Yes.  Between thirty and forty-five

11   minutes, I think, Your Honor.

12             THE COURT:  All right.  And Counsel?

13             MR. FITZPATRICK:  Yes, Your Honor?

14             THE COURT:  How long are you going to be?

15             MR. FITZPATRICK:  Judge, I mean, it wouldn't be

16   anything like that.  Maybe five, ten, fifteen minutes tops.

17             THE COURT:  All right.  And Attorney --

18             MR. PARKINSON:  Probably thirty minutes, Your Honor.

19             THE COURT:  So about an hour and a half for openings

20   and then we'll get into the first witness.

21             MS. STRAM:  Yes, Your Honor.

22             THE COURT:  So if we start at 1:30, I don't know

23   how -- we had a problem with bringing lunch to -- they brought

24   some lunch and not for others.  So I got to give this juror a

25   little bit of time to have lunch.  We brought extra lunch for
```

```
 1    her, if she likes it.  I'm not so sure she's going to like it,
 2    but we'll start at 1:30 then.  I think that would be -- that
 3    gives you time to have a little bit of lunch and we'll start at
 4    1:30.  That puts us in a situation where by 3 o'clock you're
 5    going to have to be calling witnesses.
 6              MS. STRAM:  Yes, Your Honor.
 7              THE COURT:  All right.
 8              MS. STRAM:  But do you intend to take an afternoon
 9    break today just so we can budget time for witnesses?
10              THE COURT:  Yes, we'll take a -- if we start at 1:30,
11    we'll take a break at 3 --
12              MS. STRAM:  3 o'clock.  Okay.
13              THE COURT:  -- for fifteen minutes.
14              THE COURT:  And then we'll go to 5.
15              MS. STRAM:  Okay.  Yes, Judge.
16              THE COURT:  And I'll put out a schedule for the
17    balance of the month.  And I'll discuss in my preliminary
18    instructions my schedule with the with the jury.  All right.
19    Thank you.
20              MS. STRAM:  Yes, Your Honor.
21              THE COURT:  I'll see you at 1:30.
22              THE COURT OFFICER:  All rise.
23              MR. FITZPATRICK:  Do you prefer counsel to remain at
24    the podium or --
25              THE COURT:  So you are free to walk about, but I
```

```
 1    just -- if you get to be annoying, I will tell you, and I will

 2    send you back to the podium.  But I don't want you to be

 3    invading the space of the jury.

 4              MR. FITZPATRICK:  Understood, Your Honor.

 5              THE COURT:  You could stay a little bit back in the

 6    middle of the well.  That's fine.  Government could also do

 7    that if they wish.

 8              MS. STRAM:  Thank you, Your Honor.

 9              THE COURT:  Yeah.

10              MS. STRAM:  I'll do my best not to be annoying.

11         (Recess at 12:54 p.m., until 1:41 p.m.)

12              THE COURT OFFICER:  All rise.

13              THE COURT:  Remain standing.  All right.  Remain

14    standing.  You're going to administer the oath?

15                          JURORS SWORN

16              THE COURT OFFICER:  Thank you.

17              THE COURT:  All right.  You may be seated.  Good

18    afternoon, members of the jury.  Finally, I'm able to give you

19    my preliminary instructions, and you're about to listen to the

20    opening statements of the Government and the defense.  And

21    unfortunately, we have some unavoidable delays and I appreciate

22    Alternate No. 1, I think, now, for your note.  So I will speak

23    about the schedule for the balance of this week, and then I

24    will hopefully by the end of the day, today and tomorrow, I

25    will give you the schedule for the balance of the month.
```

1    So now that you have been sworn, let me talk to you a

2    little bit about what your role as jurors in this case will be.

3    Under our system of justice, the role of the jury is to find

4    the facts of the case based on the evidence presented during

5    the course of the trial.  You must decide the facts only from

6    the evidence presented to you in this trial.  From that

7    evidence that you will be hearing and seeing, you will decide

8    what the facts are and then apply to those facts the law that I

9    will give you in my final instructions, and that's how you go

10   about reaching your verdict.

11   Whatever your verdict, it will have to be unanimous.

12   All of you must agree to it or there will be no verdict.  In

13   the jury room, you will discuss the case among yourselves, but

14   ultimately, each of you will have to make up his or her own

15   mind.  Therefore, each of you have a have a responsibility

16   which you cannot avoid, and you should do your very best during

17   the trial to fulfill this responsibility.

18   I play no part in finding the facts, and you should

19   not take anything that I may say or do during the course of the

20   trial as indicating to you what I think about the evidence of

21   what I think about what your verdict should be.  My role as the

22   trial judge in this case is to make whatever legal decisions

23   have to be made during the course of the trial, and at the

24   conclusion of the trial, discuss with you and explain to you

25   the legal principles that will guide you in making your

1    decision.

2          Again, you must apply my instructions about the law.

3    Each of the instructions is important.  You cannot substitute

4    your own notion or opinion about what the law is or ought to

5    be.  You must follow the law that I give you, whether you agree

6    with it or it or not.  Perform these duties fairly and

7    impartially.  Do not allow sympathy, prejudice, fear public

8    opinion to influence you in any way.  You should also not be

9    influenced by any person's race, color, religion, national

10   ancestry, gender, sexual orientation, profession, occupation,

11   celebrity, economic circumstances, or position or station in

12   life or in the community.

13         Members of the jury, the Sixth Amendment of the United

14   States Constitution guarantees a trial by an impartial jury.

15   This means that as jurors, you must decide this case based only

16   on the evidence and the law presented to you in this courtroom.

17   Until all the evidence and the arguments have been presented to

18   you and you begin your deliberations, you may not discuss this

19   case with anyone, even your other fellow jurors.

20         After you start to deliberate, you may discuss the

21   case with your other fellow jurors.  You may discuss the

22   evidence and the law as it has been presented, but only with

23   your fellow jurors after you have heard of all the evidence,

24   heard the arguments and heard my instruction.  You cannot

25   discuss this case with anyone else until you have returned the

1    verdict and the case has come to an end.

2          And now, I'm going to take the opportunity to briefly

3    walk you through some specific examples of what this really

4    means.  So here are some important rules that you should keep

5    in mind as you listen to the case.

6          First and foremost, you have to keep an open mind.  Do

7    not make up your mind about the verdict until you have heard

8    all the evidence in the case and I have given you the final

9    instructions about the law at the end of the of the trial, and

10   you have the opportunity to discuss the case with your fellow

11   jurors during your deliberations.

12         Secondly, do not discuss the case among yourselves

13   until the end of the trial when you go back to the jury room to

14   begin your deliberations.  You need to allow each juror the

15   opportunity to keep an open mind throughout the entire trial.

16   During the trial, you may talk with other fellow jurors about

17   anything else of a personal nature or of common interest.

18         Third, during the trial, you should not speak to any

19   of the parties, any of the lawyers, or any of the witnesses

20   involved in this case, not even to pass the time of day.  If

21   any lawyer, party, or witness does not speak to you when they

22   pass you in the hallway or downstairs or in the street,

23   remember, it is because they are not supposed to talk to you or

24   visit with you either.  This is why we have directed that you

25   be, sort of, guided by the marshals as to your movements in the

1    courthouse.

2          Do not talk with anyone else or listen to others talk

3    about this case until the trial has ended and you have been

4    discharged as a juror.  So make sure that you display your

5    badges at all times, because at least that will signal to other

6    people who are coming in and out of the case that you are

7    serving on the jury and that they should refrain from speaking

8    about cases, including this case, in your presence.

9          It is important not only that you do justice in this

10   case, but that you give the appearance of doing justice.  If

11   anyone tries to talk to you about the case during the trial,

12   please report that to me through my courtroom deputy, and I

13   will address it immediately, and do not discuss it with your

14   other fellow jurors.

15          In this case, also do not discuss this case with

16   anyone outside the courtroom or at home.  I think I already

17   told you that you should not even talk to anyone, including

18   your family and friends.  And you, of course, may tell your

19   family and friends that you have been selected as a member of a

20   trial jury in this case.  You may even tell them how long the

21   trial is expected to last.  However, you should also tell them

22   that the judge instructed you not to talk to them anymore about

23   the case, and you should not talk to them about the case

24   either.  The reason is very simple.  Sometimes someone else's

25   thoughts can influence you, and your thinking should be

```
 1    influenced only by what you learn in this courtroom, what we
 2    all together in the presence of the Court.
 3          Until the trial is over and your verdict has been
 4    announced, again, please do not watch or listen to any
 5    television, radio, news programs, or reports about this case,
 6    or read anything on the news or internet stories or articles
 7    about this case, or even anything on anyone involved with this
 8    case.  Remember what I said yesterday?  Do not use any
 9    electronic devices, including your cell phone, while in the
10    courtroom and during your deliberations.  These devices may be
11    used during the breaks or recesses for personal uses only, but
12    may not be used to obtain or disclose information about this
13    case to anyone outside the courtroom or to relay information
14    that you learned in this courtroom to anyone.
15          You may not communicate with anyone about the case by
16    phone, email, text, through any blog, website, online forum, or
17    internet chat room, or through any social media site, including
18    but not limited to Instagram, Facebook, X, TikTok, Snapchat,
19    WhatsApp, YouTube, and LinkedIn.  You may obtain or disclose
20    information about this case using any other form -- you may
21    not.  I'm sorry.  You may not obtain or disclose information
22    about this case using any forms of technology or social media,
23    even if I have not specifically mentioned the technology here
24    today.  Technology is changing every day as we speak, and so
25    something comes about that is being used, please refrain from
```

1    using it and please follow my instructions.  That's really

2    important.

3            Please note that these instructions are all about

4    communications about this case.  Even those that are not

5    directed at any particular person or group, communications like

6    blog posts, tweets can be shared to an ever-expanding circle of

7    people and can have an unexpected impact on a trial.  I think I

8    talked to you yesterday about, for example, a post you make to

9    your social media account might be viewable by a witness who is

10   not supposed to know what is happening in the courtroom before

11   he or she testifies before you.  For these reasons, you must

12   inform me immediately if you learn about or share any

13   information about the case outside of the courtroom, even if by

14   accident, or if you discover that another juror has done so.

15           During the trial, you must not conduct any independent

16   investigation about this case, or matters about this case or

17   any legal issues, individuals, or the entities involved in this

18   case.  And this means that you must not visit the scene -- and

19   this happened in North Philadelphia.  I gave you all those

20   addresses.  Don't go there.  Don't visit those scenes.  Do not

21   conduct any search in the internet or websites or blogs for

22   additional information, or use a computer, cell phone, or other

23   electronic device, or any other method to obtain information

24   about this case, this type of case, the parties in this case,

25   or anyone involved or connected with this case.  Do not try to

1  find out information from any source outside the confines of

2  this courtroom.

3          Again, I'm going to repeat this a lot during the

4  course of the trial.  I think I told you yesterday you're going

5  to get sick of it and you're going to memorize it by the time

6  we finish with this trial.  So you have to decide this case

7  based only on the evidence presented in this courtroom and the

8  law that I give you at the conclusion of the trial.  It will be

9  highly inappropriate for you to try to supplement your

10  knowledge about this case from any other source.  Again,

11  misinformation, wrong information is out in the public domain

12  and more importantly, the parties will not have not been given

13  an opportunity to vet the information through cross-examination

14  to test the reliability and accuracy of the information that

15  may be out there in the public domain.

16          During the trial, court security officers will direct

17  you in and out of the building and to the jury room during

18  breaks and lunch.  Follow their instructions of the court

19  security officers at all times.  Their instructions are simply

20  meant to prevent you from unintentionally interacting with

21  witnesses, the lawyers in the case, the defendants, and others

22  that may have something to do with this case.

23          Finally, members of the jury, your job is to decide

24  guilt or innocence -- whether the Government has proven the

25  charges beyond a reasonable doubt.  You should not concern

1    yourself or with or consider the possible punishment that might

2    be imposed if you return a verdict of not guilty.

3           Members of the jury, during the trial -- and you

4    already saw a little bit of this during the voir dire

5    process -- and it may become necessary for me to talk to the

6    lawyers about matters outside your hearings.  This is what we

7    call sidebar conferences, and we had a few of those during jury

8    selection.  If that happens, please be patient.  We also ask

9    that you advise me through my courtroom deputy if you are able

10   to hear any of the bench or sidebar conferences, because the

11   purpose of those benches sidebar conferences is to hold these

12   discussions outside of your hearing for proper, important

13   reasons.

14          I need to know sometimes and hear argument to

15   determine whether or not the evidence is relevant and should be

16   considered by you or if an answer should be given and

17   considered by you.  I know that you may be curious about what

18   we are discussing, but we are not trying to keep information

19   from you during those sidebar conferences.  These sidebar

20   conferences are often necessary for me to discuss with the

21   lawyers objections that they make to evidence, and to be sure

22   that the evidence presented to you is relevant and correctly

23   presented to you under the Federal Rules of Evidence.  We will,

24   of course, do what we can to keep the number and the length of

25   those conferences to a minimum.  If I think that the conference

1    is going to be rather lengthy, I will call a recess and give

2    you an opportunity to go back to the jury room for a break

3    while I discuss the matters with the lawyers here in court.

4    And I may not always grant a lawyer's request for a conference.

5    If I do not grant the lawyer, or if I deny the request for a

6    conference, I don't want you to take that as a suggestion of my

7    opinion of the case or whatever your verdict should be, members

8    of the jury.  And finally again, you are not to concern

9    yourself with the possible punishments.

10            Members of the jury, I think my staff -- I already see

11    that you have a notepad and a pen.  Let me give you some

12    important rules about notetaking.  At the end of the trial, you

13    will have to make your decision based on what you remember of

14    the evidence.  Your memory is really the key.  You will not

15    have a written transcript of the testimony for you to review at

16    the end of the trial, so I ask that you pay close attention to

17    the testimony of the witnesses as the testimony of the witness

18    is given here from the witness stand.  If you wish, you may

19    take notes to help you remember what the witness said.  You

20    already have, I believe, pens, pencils, and paper.  If you do

21    take notes -- and how much or whether to take notes is entirely

22    up to you -- please keep them to yourselves until the end of

23    the trial when you and your fellow jurors go to the jury room

24    to begin discussing the case.

25            Let me give you some important rules to remember about

1    notetaking.  So notetaking is permitted but is not required.

2    You are not required to take notes.  How much notes you want to

3    take, if any, is entirely up to each of you.  Please make sure

4    that notetaking, however, does not distract you from your task

5    as jurors.  You must listen to all the testimony of each

6    witness.  You also need to decide whether and how much to

7    believe each witness.  That will require that you watch the

8    witness as the witness is testifying and appearing before you.

9    Their behavior, the manner of each witness while they are

10   testifying.  You cannot write down everything that is said, and

11   there is always a fear that a juror will focus so much on

12   notetaking that he or she will miss the opportunity to make

13   important observations about the witness.

14            Also notes are just a memory aid.  They are not

15   evidence.  Notes are not a record of or written transcript of

16   the trial.  Whether or not you took notes, you will need to

17   rely on your own memory of what was said.  Notes are only to

18   assist your memory, and you should not overly influence by

19   notes.  When you go back to deliberate, do not take any more --

20   or do not give any more or less weight to the views of your

21   fellow jurors just because that juror did or did not take

22   notes.  And do not assume that just because something is in

23   someone's notes that it necessarily took place here in court.

24   Because it is just as easy to write something down incorrectly

25   as it is to hear it or remember it incorrectly.  Notes are not

1    entitled to any greater weight than each jurors' independent

2    memory of the evidence.  You should also rely on your

3    individual collective memories when you deliberate and reach

4    your verdict.

5            Also, members of the jury, please do not take the

6    notes away from the court at the end of the day.  Just leave

7    them behind.  My staff will gather them up and at the end of

8    each day and redistribute them to you at the beginning of the

9    next day.  My staff is responsible for making sure that no one

10   looks at your notes.  So immediately after you have finished

11   your deliberations and have said your verdict, my staff will

12   collect your notes and will destroy your notes.

13           Members of the jury, as you will see, the only people

14   that could ask questions in the courtroom are the lawyers -- of

15   the witnesses are the lawyers and the judge.  You are not

16   permitted to ask questions of the witnesses.  If, however, you

17   are unable to hear a witness or a lawyer clearly while they are

18   speaking, either from the witness stand or the lawyer speaking,

19   please raise your hand and let me know, because at that point

20   in time, we will correct the situation.  Often it happens in

21   trials there is something going on that interferes with your

22   ability to hear because someone opened the -- the barristers

23   had to get into the courtroom, and it sounds really loud, as

24   you will see shortly, and that might interfere with your

25   ability to hear.  In that case, if you miss important

1    testimony, just raise your hand and let me know, because we

2    could have the witness repeat it right then and there.  You

3    cannot rely on my help to remember what they said much later on

4    in the trial during deliberations because I may not be

5    permitted to discuss or highlight that testimony for your

6    benefit.  So it's really important that you have a complete and

7    accurate recollection of the testimony of each witness.

8           Members of the jury, I think you probably are all

9    familiar from watching television of the process of a trial,

10   but it doesn't happen that quickly, as you saw in this

11   courtroom.  Even jury selection could take time.  But every

12   trial is structured in the same way and proceed in the same

13   manner.

14          First, the lawyer will make an opening statement to

15   you.  And the in this case, the Government -- the

16   prosecution -- may make an opening statement at the beginning

17   of the case, and then the defense lawyers may make an opening

18   statement immediately after the prosecution's opening

19   statement, or if the defendant wish, they may postpone the

20   making of an opening statement until after the Government

21   produces its evidence.  Just remember, defendants are not

22   required to make any opening statements.  And the opening

23   statement is simply for the lawyers to give you an outline to

24   help you understand what each of the parties expects the

25   evidence to show at the conclusion of the trial.

1          There are some rules that I want you want you to

2     remember, which is the what is said in the opening statements

3     is not itself evidence.  So the evidence comes from the

4     witnesses who will be testifying under oath.  So that is the

5     first stage of the trial.

6          The second stage of the trial, after the opening

7     statements, is for the Government to begin to call witnesses it

8     thinks proves the charges stated in the indictment.  The

9     Government will present witnesses, and the defense lawyers may

10    cross-examine those witnesses, and then the Government may have

11    also an opportunity to offer documents and other exhibits in

12    evidence.

13         After the Government presents all their evidence in

14    this case and they rest, the defendants may present evidence,

15    but I want to tell you right now -- and I'm going to repeat

16    this throughout the course of the trial -- they are not

17    required to do so.  As I will tell you many times during the

18    course of the trial, the Government always has the burden or

19    obligation to prove each and every element of the offenses

20    charge beyond a reasonable doubt.  The defendants are presumed

21    to be innocent of the charges.  The law never imposes on a

22    defendant in a criminal case the burden of proving their

23    innocence by calling any witnesses, producing any exhibits, or

24    introducing any evidence.

25         After all the evidence has been presented, then the

1    lawyers will have an opportunity to present to you the closing

2    arguments, and that is designed to present to you the parties

3    theories about what the evidence has shown and what conclusions

4    may be drawn from the evidence that they have produced.

5            As the opening statement, the closing statements are

6    not evidence either, just as what I told you just a minute ago

7    about opening statements.  After you hear the closing

8    arguments, then I will give you orally a written final

9    instructions concerning the law that you must apply to the

10   evidence in this trial, as I am doing now.  And I may also give

11   you instructions on certain aspects of the law throughout the

12   trial, as well as the end of the trial.  All of my

13   instructions -- any instructions that I give you during the

14   course of the trial or the end of the trial -- must be taken

15   together, constitute the law that you must follow, and apply to

16   this case.

17           Members of the jury, after my final instructions on

18   the law then you will retire to consider your verdict.  Your

19   verdict is secret.  You will not have or be required to explain

20   your verdict to anyone.  However, your verdict must be

21   unanimous.  All jurors -- and the trial jury will be twelve of

22   the eighteen -- must agree to it or there will be no verdict.

23   It has to be unanimous.

24           Again, you must keep your minds open during the trial.

25   Do not make up your mind about any of the questions in this

1    case until you have heard all pieces of evidence and all the

2    law that you have to apply.  In other words, until you have

3    begun your deliberations.

4          Let me give you a little bit of a bird's eye view of a

5    couple of points that you need to remember as you begin to

6    listen to the testimony.  And that is that in making your

7    decision, ultimately, in this case, that decision has to be

8    based only on the evidence that you will see and hear in this

9    courtroom.  Please do not let any rumors, suspicions, or

10   anything else that you may see or hear outside of the courtroom

11   influence you in any way.  The evidence from which you could

12   find the facts consists of the testimony of all the witnesses

13   who will be testifying under oath, documents and other exhibits

14   that are received and admitted in admitted in evidence, any

15   fact of testimony that is stipulated to that is not formally

16   agreed by the lawyers that you could take that as established

17   fact.  That is the source of the evidence from which you could

18   find facts.

19         Now, I already told you, opening statements of the

20   lawyers and closing statements of the lawyers are not evidence.

21   Questions by the lawyers that -- questions by the lawyers and

22   questions that I may ask are not evidence.  You must not assume

23   that a fact is true just because the lawyer or I ask a question

24   about it.  If the witness asks -- if the witness answers -- it

25   is the witness answer that gives you the evidence.  Of course,

1    sometimes you may have to consider the question to know what

2    the witnesses mean by their answer.  So for example, if the

3    witness said yes to a question, you will have to consider the

4    question to understand what the witness is saying.

5         Also objections by the lawyer, including objections in

6    which the lawyers state -- facts are not evidence.  Usually if

7    a lawyer makes an objection, I will turn to the lawyer and ask

8    to please cite the rule they relied on.  I will get the

9    opposing counsel's response.  I don't tolerate speeches, so

10   they cannot argue facts.  But if they do, just make sure that

11   you understand that that is not evidence.  Any testimony that I

12   strike or tell you to disregard is not evidence.  And any

13   evidence that you see or hear about the case outside of the

14   courtroom is not evidence.

15        Please use your common sense in weighing the evidence.

16   Consider the evidence in light of your everyday experience with

17   people on event and give it whatever weight you believe that

18   that evidence deserves to receive.  If your experience and

19   common sense tells you that a certain evidence reasonably leads

20   to a conclusion, you may reach that conclusion.

21        Members of the jury, the rules of evidence controls

22   what is received in evidence.  So when a lawyer asks the

23   questions or offers an exhibit into evidence, and the lawyer on

24   the other side thinks that it is not permitted under the

25   Federal Rules of Evidence, that lawyer may object.  An

1   objection is simply means that the lawyer is asking me to

2   decide whether the evidence should be allowed under the Federal

3   Rules of Evidence.  I tell you that lawyers have a

4   responsibility to their clients to make objections when they

5   think that what is being offered is improper under Federal

6   Rules of Evidence.  You should not be influenced by the fact

7   that an objection was made, and you should not be influenced by

8   my rulings on an objections to evidence.  If I overrule an

9   objection, then the question may be answered or the exhibit may

10  be received as evidence, and you should treat that testimony or

11  that exhibit like any other.

12          I may allow evidence, whether testimony or exhibit,

13  only for a limited purpose.  If I do that, I generally will

14  instruct you how to consider the evidence and to consider that

15  evidence only for that limited purpose, and you must follow

16  those instructions.  If I sustain an objection to a question,

17  the question will not be answered.  The exhibit will not be

18  received as evidence.  And whenever I sustain an objection, you

19  have to disregard the question or the exhibit entirely.  Do not

20  think about or guess what the witness might have said in answer

21  to the question.  Do not think about or guess what the exhibit

22  might have shown.  Sometimes the witness may have already

23  answered before the lawyer objects or before I rule on the

24  objection.  If that happened, if I sustain the objection, I

25  usually then will say disregard the answer that was given and

1    you ought to strike it from your mind.

2          Also, I may order that some testimony or evidence be

3    stricken or removed from the record.  If I do that, please know

4    that you will have to disregard that evidence.  That means that

5    when you are deciding the case, you must not consider or be

6    influenced in any way by the testimony or the evidence that I

7    told you to disregard.  And of course, all the lawyers may call

8    your attention to certain facts or factual conclusions that

9    they think are important.  What the lawyers say is not evidence

10   and it is not binding upon you.  It is your recollection and

11   interpretation of the evidence that controls the decision in

12   this case.  And do not assume from anything that I do or say

13   during the trial that I have any opinion about the evidence or

14   about what any of the issues in this case -- about any of the

15   issues in this case or about what your verdict should be.

16         Members of the of the jury, I have a couple of more

17   matters before you begin to listen to the opening statements,

18   so bear with me.  You will see, during the course of the trial,

19   that there are two types of evidence.  It's direct evidence

20   that were presented to you or circumstantial evidence, indirect

21   evidence.  Direct evidence simply means evidence which, if

22   accepted by the you as credible, directly proves that fact at

23   issue.  An example of direct evidence occurs when a witness

24   testified from something that the witness experienced from

25   their own senses.  Something that the witness saw, touch,

1    heard, smell.  Direct evidence.

2            Circumstantial evidence, on the other hand, is

3    evidence which, if accepted by you as credible, indirectly

4    proves a fact, that issue.  It is evidence that proves one or

5    more facts from which you could find or infer the existence of

6    some other fact or facts at issue.  An inference is simply a

7    deduction or conclusion that recent experience comes you should

8    make from the evidence.

9            An inference is not a suspicion or guess or surmise.

10   It is a reasoned, logical decision to find that a disputed fact

11   exists and the basis of another fact.  So for example, if a

12   witness testified that she had been outside and saw it was

13   raining outside, that will be direct testimony that it was

14   raining outside.  On the other hand, if the witness testified

15   that she saw someone walk in from outside wearing a wet

16   raincoat and carrying a wet umbrella, that testimony will be

17   circumstantial evidence that it was raining, from which you

18   could infer that it was raining outside.  You will not have to

19   find that it was raining, but you are permitted to find that it

20   was raining.  Remember that sometimes different inferences may

21   be drawn from the same set of facts and circumstances.  The

22   Government, on the one hand, may ask you to draw one inference

23   and the defense may ask you to draw another inference.  You and

24   you alone must decide what inferences you will draw based on

25   all the evidence in this case.  You should consider all the

1   evidence that is about to be presented to you in this trial,

2   direct and circumstantial, because the law really makes no

3   distinction between the way that you should give direct or

4   circumstantial evidence.  It is for you to decide how much

5   weight to give any of the evidence.

6        Members of the jury, to find the facts in the case,

7   you have to decide what testimony you believe and what

8   testimony you do not believe.  Remember that you are the sole

9   judges of the credibility of each of the witnesses.

10  Credibility refers to whether the witness is worthy of belief,

11  whether the witness is truthful, whether the witness is

12  accurate.  And remember that you, the jury, are free to believe

13  everything a witness says or only part of it or none of it.

14  You may decide whether to believe a witness based on his or her

15  behavior or manner of testifying, the explanation the witness

16  gives you, and all the other evidence in this case, just as you

17  would in any court matter where you are trying to decide if a

18  purpose (sic) is being -- if a person is being truthful,

19  straightforward, and accurate in his or her recollection of

20  events.

21       In deciding the question of credibility, remember to

22  use your common sense, your good judgment, and your experience

23  as you have lived life.  But let me give you a number of

24  factors that you should consider in deciding whether to believe

25  a witness or not.  Consider the opportunity and the ability of

1   the witness to see or hear or know the things about which the

2   witness testify here in court; the quality of the witness'

3   knowledge, understanding and memory; the witness appearance,

4   behavior, manner while testifying; whether the witness has any

5   interest in the outcome of the case or any motive, bias or

6   prejudice; any relation the witness may have with a party in

7   the case and any effect that the verdict may have on the

8   witness; whether the witness said or wrote anything before the

9   trial that is different from the testimony here in open court;

10  whether the witness is consistent or inconsistent with all the

11  evidence that you accept as credible; and any other factors

12  that bear upon whether the witness should be believed.

13          Inconsistencies or discrepancies in witnesses'

14  testimony, or for that matter between the testimony of

15  different witnesses, may or may not cause you to disbelieve

16  that witness' testimony.  Remember that two people witnessing

17  an event may simply see it or hear it happen differently.  And

18  mistaken recollection, like failure to recollect, is a common

19  human experience.  In weighing the effect of an inconsistency,

20  you should consider whether it is about a matter of importance

21  or an insignificant detail.  You should also consider whether

22  the inconsistent is innocent or intentional.  You are not

23  required to accept the testimony of a witness, even if the

24  testimony is not contradicted and the witness is not impeached.

25  You may decide that the testimony is not worthy of your belief

1   because of a witness bearing and demeanor, or because of the

2   inherent improbability of the testimony, or for other reasons

3   that are sufficient to you.

4         After you make your own judgment about whether to

5   believe the testimony of the witness, then you could attach to

6   that witness testimony the importance of the way you think that

7   testimony deserves to receive.  And again, members of the jury,

8   the weight of the evidence to prove a fact does not necessarily

9   depend on the number of witnesses testify.  What is really more

10  important than numbers is how credible, believable the

11  witnesses are and how much weight you think your testimony

12  deserves to receive.

13        Members of the jury, I'm going talk to you about the

14  presumption of innocence and reasonable doubt, and then I will

15  review with you the indictment, and you will hear the opening

16  statements in a few minutes.  The defendant, Kelvin Jimenez and

17  Dominique Parker, have pleaded not guilty to the offenses

18  charged.  They are presumed innocent.  They start the trial

19  with a clean slate with no evidence against them.  The

20  presumption of innocence stays with the defendants unless and

21  until the Government presents evidence that overcomes that

22  presumption by convincing you that they are guilty of the

23  offenses charged beyond a reasonable doubt.

24        The presumption of innocence requires that you find

25  the defendant not guilty, unless you are satisfied that the

1    Government has proved guilt beyond a reasonable doubt.  The

2    presumption of innocence means that they have no burden or

3    obligation to present any evidence at all, or to prove that he

4    is not guilty.  The burden or obligation of proof is on the

5    Government to prove the defendants are guilty, and this burden

6    never shifts throughout the trial.  It always stays with the

7    Government.

8            In order for you to find the defendant guilty of the

9    offenses charged, the Government must convince you that they

10   are guilty beyond a reasonable doubt.  That means that the

11   Government must prove each and every element of the offenses

12   charged beyond a reasonable doubt.  A defendant cannot be

13   convicted based on suspicion, conjecture, or surmise, but only

14   on evidence convincing and proving the case beyond a reasonable

15   doubt.

16           Proof beyond a reasonable doubt does not mean proof

17   beyond all possible doubt or to a mathematical certainty.

18   Possible doubts are doubts based on conjecture.  Surmise are

19   not reasonable doubts.  A reasonable doubt is a fair doubt

20   based on reason, logic, common sense, or experience.  A

21   reasonable doubt means a doubt that will cause an ordinary,

22   reasonable person to pause, to hesitate to act in matters of

23   importance in his or her own life.  It may arise from the

24   evidence, or the lack of evidence, or the nature of the

25   evidence.  If, after all the evidence, you are convinced that

1    the Government has proved each and every element of the

2    offenses charged, you should return a guilty verdict.  However,

3    if you have a reasonable doubt as to an element of the offense,

4    you must return a verdict of not guilty.

5            Members of the jury, the defendants are charged with

6    offense -- the defendants are charged with different offenses.

7    And I'm going to take a minute to explain to you in more detail

8    which defendants are charged with which offenses.  Before I do

9    that, however, I want to emphasize several things.  The number

10   of offenses charged is not evidence of guilt.  This should not

11   be influenced in any way your decision in this case.  Also,

12   under our system of justice, guilt or innocence is personal and

13   individual.  You must separately consider the evidence against

14   each defendant and each of the offenses charged.  And you must

15   return a separate verdict for each defendant for each offense.

16   For each defendant and each offense.  You must decide whether

17   the Government has proven beyond a reasonable doubt that a

18   particular defendant is guilty of a particular offense.  Your

19   decision on one defendant or any one offense, whether guilty or

20   not guilty, should not influence your decision on any other of

21   the defendants or offenses.  Each defendant and each offense

22   should be considered by you separately.

23           Now, I will summarize the exact crimes the Government

24   has accused the defendants of committing.  The defendants in

25   this case are Kelvin Jimenez and Dominique Parker.  The charges

1  include conspiracy to participate in a racketeering enterprise,

2  conspiracy to distribute controlled substances, murder in aid

3  of racketeering, assault with a dangerous weapon in aid of

4  racketeering, attempted assault with a deadly weapon in aid of

5  racketeering, causing the death through use of a firearm during

6  and in relation to a crime of violence or drug trafficking

7  offense, and carrying and using a firearm during and in

8  relation to a crime of violence, and maintaining a

9  drug-involved premises.

10         An indictment is just a formal way of specifying the

11 exact crime the defendants are accused of committing.  An

12 indictment is simply a description of the charges against each

13 defendant.  It is an accusation only.  An indictment is not

14 evidence of anything, and you should not give any weight to the

15 fact that the defendants have been indicted in making your

16 decision in this case.  To help you follow the evidence that

17 you are about to see following the opening statements, let me

18 brief you -- briefly give you an outline of the elements of

19 each offense, each of which the Government must prove beyond a

20 reasonable doubt in order to convict the defendants of the

21 offenses charged.

22         Count I of the superseding indictment charges Kelvin

23 Jimenez and Dominique Parker with conspiracy to participate in

24 a racketeering enterprise.  To find the defendant guilty of

25 this offense, you must find that the Government proved each of

1    the following elements for each of the defendants beyond a

2    reasonable doubt.

3            To establish a conspiracy to participate in a

4    racketeering enterprise, the Government must prove the

5    following elements beyond a reasonable doubt:  that two or more

6    persons agreed to conduct or to participate, directly or

7    indirectly, in the conduct of an enterprise affairs through a

8    pattern of racketeering activity; that the defendant was the

9    party to or member of that agreement; and that the defendant

10   joined the agreement of conspiracy knowing of the objective --

11   knowing of his objective to conduct the participate in the

12   conduct of an enterprise affairs through a pattern of

13   racketeering activity; and intending to join together at least

14   one other alleged conspirator to achieve that objective.  That

15   is that the defendant and at least one other alleged

16   conspirator share unity of purpose and the intent to achieve

17   the objective of conducting or participating in the conduct of

18   an enterprise affairs through a pattern of racketeering

19   activity.

20           Count II of the superseding indictment charges Kelvin

21   Jimenez and Dominique Parker with conspiracy to distribute

22   controlled substances.  To find defendant guilty of those

23   offenses, the Government must prove the elements beyond a

24   reasonable doubt.  One, that two or more people agree to

25   distribute, possess, or possess with the intent to distribute a

1   controlled substance; that the defendant was a party or member

2   of that agreement; that the defendant joined the agreement or

3   conspiracy knowing of the objectives to distribute and possess

4   with intent to distribute a controlled substance; and intended

5   to join together while another person alleged conspirator to

6   achieve those objectives, that is, that the defendant and at

7   least one other alleged conspirators share unity of purpose and

8   the intent to achieve that objective; that the cocaine base is

9   a Schedule II controlled substance; and that at least five

10  kilograms or more but less than fifteen kilograms of cocaine

11  base was within the scope of the conspiracy and was the result

12  of the defendant's own conduct, or was reasonably foreseeable

13  to the defendant.

14          Count III of the superseding indictment charges Kelvin

15  Jimenez with murder in the aid of aid of racketeering.  Count

16  XIV of the superseding indictment charges Dominique Parker with

17  the same.  To establish the murder in aid of racketeering, the

18  Government must prove the following elements beyond a

19  reasonable doubt: that the enterprise assisted at the time

20  charged in the superseding indictment; that the enterprise was

21  engaged in racketeering activity; that the enterprise was

22  engaged and/or is objectives affected interstate commerce or

23  foreign commerce; that the defendant committed murder; that the

24  defendant committed the murder for one or more of the following

25  motives or pecuniary value that was provided by the enterprise;

1    or for the purpose of gaining entrance to, or maintaining or

2    increasing the defendant's position in the enterprise; and that

3    the underlying crime of violence violated specific federal or

4    state statutes as charged in the superseding indictment, in

5    this case, murder in violation of Pennsylvania Code Title 18,

6    Section 2502(a), which provides a criminal homicide --

7    constitutes murder in the first degree when it is purpose and

8    the intent to achieve the objective -- when its purpose is --

9    I'm sorry.  A criminal homicide constitutes murder in the first

10   degree when it is its purpose committed an intentional killing.

11        A criminal homicide constitutes a murder of the second

12   degree when it is committed while defendant was engaged as a

13   principal or an accomplice in the perpetration of a felony.

14   All other kinds of murder shall be murder of the third degree.

15   Intentional killing means any killing by means of poison or

16   (indiscernible), or by any other kind of willful, deliberate,

17   premeditated killing.  The person is guilty of criminal

18   homicide if he intentionally, knowingly, or recklessly or

19   negligently causes the death of another human being.

20        Counts IV, V, XII, XVII, and XXII, the superseding

21   indictment charged Kelvin Jimenez with assault with a dangerous

22   weapon in aid of racketeering.  And Counts XII and XV charge

23   Dominique Parker with the same.  To establish assault with a

24   dangerous weapon in the aid of racketeering, the Government

25   must prove beyond a reasonable doubt that the enterprise

1  assisted at the time charged in the superseding indictment;

2  that the enterprise was engaged in a racketeering activity;

3  that the enterprise was engaged in and/or its activities

4  affected interstate or foreign commerce; that the defendant

5  knowingly and intentionally committed an act -- committed an

6  assault with a dangerous weapon, that is, a firearm; that the

7  defendant committed the assault with a deadly weapon for more

8  or more of the following motive: for pecuniary value that was

9  provided by the enterprise or for the purpose of gaining

10  entrance to or maintaining or increasing the defendant's

11  position in the enterprise; and that the underlying crime of

12  violence violated specific federal or state statute as charged

13  in the superseding indictment.  In this case, aggravated

14  assault in violation of Pennsylvania Laws, Title 18, Section

15  2702(a)(4), which provides that a person is guilty of

16  aggravated assault if he attempts to cause or intentionally or

17  knowingly causes bodily injury to another with a deadly weapon,

18  as defined in Title 18, Section 2301, which defines bodily

19  injury as impairment of physical condition or substantial pain

20  or/and deadly weapon as a firearm.

21          Count XXX charges Dominique Parker with attempted

22  assault with a dangerous weapon in aid of racketeering.  To

23  find Parker guilty of this offense, the Government must prove

24  the following elements beyond a reasonable doubt: that the

25  enterprise existed at the time charging the superseding

1   indictment; that the enterprise was engaged in racketeering

2   activity; that the enterprise was engaged in and/or its

3   activities affected interstate or foreign commerce; and that

4   the defendant knowingly, intentionally attempted to commit

5   assault with a dangerous weapon that is a firearm; and that the

6   defendant committed the assault with a deadly weapon for one or

7   more of the following motives.  For pecuniary value that was

8   provided by the enterprise, or for the purpose of gaining

9   entrance to or maintaining or increasing the defendant's

10  position in the enterprise.  And again, that the underlying

11  crime of violence violated specific federal or state law as

12  charged in the superseding indictment.  In this case,

13  aggravated assault in violation of Title 18, Section

14  2702(a)(4), which provides that a person is guilty of

15  aggravated assault if he attempts to cause or intentionally and

16  knowingly causes injury to another with a deadly weapon, as

17  defined in Title 18, Section 2301, which defines bodily injury

18  as impairment of physical condition or substantial pain and a

19  deadly weapon as a firearm.

20           Count VI of the of the superseding indictment charges

21  Kelvin Jimenez with causing death through the use of a firearm

22  during and in relation to a crime of violence.  Count XVI of

23  the superseding indictment charges Dominique Parker with

24  causing the death through the use of a firearm during and in

25  relation to a crime of violence.  To find defendants guilty of

1     this count, the Government must prove the following elements

2     beyond a reasonable doubt: that the defendant possess a

3     firearm; that the defendant did so in furtherance of a crime of

4     violence, which may be prosecuted in federal court; that is

5     under -- that it is murder in aid of racketeering in violation

6     of Title 18, Section 1959(a)(1) as charged in the superseding

7     indictment and defined above as I just stated; and that the

8     defendant caused the death of a person through the use of a

9     firearm.

10            Count XIII of the superseding indictment charges

11    Dominique Parker with carrying and using a firearm during a

12    crime of violence.  Count XIII, XVIII, and XXIII charge Kelvin

13    Jimenez with carrying and using a firearm during a crime of

14    violence.  To establish carrying and using a firearm during a

15    crime of violence, the Government would be obligated to prove

16    the following elements beyond a reasonable doubt: that the

17    defendant committed the crime of assault with a dangerous

18    weapon in aid of racketeering, in violation of Title 18,

19    Section 1959(a)(3), as charged in the superseding indictment;

20    during and in relation to the commission of the of that crime,

21    the defendant knowingly used to carry a firearm; and the

22    defendant used, carried, discharged the firearm during and in

23    relation to a crime of assault with a dangerous weapon in aid

24    of racketeering in violation of Title 18, Section 1959(a)3), as

25    charged in the superseding indictment.

1    And count XXIX charges Kelvin Jimenez and Dominique

2    Parker with maintaining a drug premises at 1688 Bridge Street,

3    Philadelphia.  To find defendants guilty of this offense, the

4    Government have to prove beyond a reasonable doubt that the

5    defendant opened or maintained any place for the purpose of

6    manufacturing, distributing, or using a controlled substance

7    and that the defendant knowingly -- each of the defendants is

8    also charged with aiding and abetting.  In order to find the

9    defendants guilty of this, you must find that the Government

10   proved each of the following elements beyond a reasonable

11   doubt: that the principal committed the offenses charged by

12   committing each of the elements of the offense; that the

13   defendant and -- that the defendant and accomplice knew that

14   the offense charged was going to be committed or was being

15   committed by the principal; and that the defendant knowingly

16   did some act for the purpose of aiding, assisting, and

17   soliciting or encouraging the principal in committing the

18   specific offense in the indictment; the principal committed the

19   specific offense and the defendant performed an act of

20   furtherance of the offense.

21   Members of the jury, what I have told you is only a

22   preliminary outline of the elements of the offenses charged so

23   you can understand the evidence that will be presented to you.

24   At the end of the trial, I will give you my final instructions

25   and the elements of the offenses charged and other matters in

1    great detail.  Those final instructions will be more detailed

2    and they will guide you in making your decision in this case.

3    But I want you to know that I usually will give you a hard copy

4    of these instructions so you could have them in the jury room

5    and you could understand the elements so you don't have to

6    stress out about the details.  I just gave you that so you

7    could understand the evidence that is going to be presented to

8    you.  That concludes my preliminary remarks.

9              Members of the jury, at this point it is 2:35, so I'm

10   going to call for the opening statements by the Government.

11             I think attorney Lauren Stram.

12             MS. STRAM:  Yes, Your Honor.

13             THE COURT:  Okay.

14             MS. STRAM:  Your Honor, before I begin, I would just

15   move for sequestration.

16             THE COURT:  Okay.  You have any witnesses in the

17   audience?

18             MR. FITZPATRICK:  No, Your Honor.

19             THE COURT:  Okay.  There are no witnesses.  How about

20   the Government?

21             MR. DIVINY:  Is Ms. Applin here?  Ms. Applin?

22             THE COURT:  Okay.  I don't think --

23             MS. STRAM:  It isn't in effect on behalf of the

24   Government, Your Honor.

25             THE COURT:  All right.  All right.  So sequestration

1    is in place.  Make sure that you don't have any witnesses while

2    the case is in progress.

3          MS. STRAM:  Thank you, Your Honor.  May I?

4          THE COURT:  You may.

5                GOVERNMENT'S OPENING STATEMENT

6          This is a case about a violent, murderous criminal

7    drug trafficking organization.  Again, they are known by

8    several different names -- SG1700, 1700 Scattergood, L Block.

9    Again, that's led by two individuals -- Dominique Parker and

10   Kelvin Jimenez.

11         As the leaders of that gang, you'll hear that they

12   supplied the drugs to sell and the guns to use; that members of

13   that gang, including these defendants, used those guns to

14   eliminate their perceived enemies and to preserve their violent

15   reputation in the community; and that they use that violent

16   reputation to preserve their status as a drug trafficking

17   organization in the Frankford section of Philadelphia.

18         These defendants benefited directly from the actions

19   of younger gang members in that group.  The younger members

20   that they cultivated, younger members that they recruited.

21   This is true even in instances where they, themselves, didn't

22   get their hands dirty in these violent acts.  Now, that's a

23   concept that the law recognizes.  A criminal gang is an

24   enterprise and all members are responsible for the actions

25   taken on behalf of that enterprise.  That's true even if they

1    weren't there.  You'll hear that some of the younger members of

2    the gangs, and at times these defendants, engaged in a series

3    of murders and violent acts, including the murder of a

4    Philadelphia police officer, Corporal James O'Connor.

5            Now, members of the jury, in the early morning hours

6    of March 13th, 2024, Corporal James O'Connor got ready for

7    work, just as he always did.  He was assigned to the

8    Philadelphia Police Department's SWAT unit.  It is his job to

9    execute what's known as high-risk arrest warrants.  And on

10   March 13th, 2020, it was his job to find and arrest Hassan

11   Elliott, a man who was wanted for murder, a man who was one of

12   Kelvin Jimenez and Dominique Parker's young boys.

13           Police had information that Hassan Elliott was living

14   or staying in the second-floor middle bedroom of 1688 Bridge

15   Street, a room that you will hear was arranged for and rented

16   by defendant Kelvin Jimenez.  A room that was used by Kelvin

17   Jimenez and Dominique Parker and other members of the gang to

18   package their drugs for sale, to store their arsenal of

19   weapons, and to hide gang members like Elliott who were wanted

20   by the police.

21           Now, just before 6 o'clock in the morning, Corporal

22   O'Connor and six other SWAT officers went to the front door of

23   1688 Bridge Street.  They lined up one after another and then

24   knocked down the front door of that property.  No one answered,

25   so another officer forced the door open and the officers

1    descended the staircase -- or excuse me -- ascended the

2    staircase.

3            Corporal O'Connor was third in line.  The officers

4    climbed that staircase loudly announcing their presence,

5    yelling, police with a warrant.  Police with the warrant.

6    Officers heard a voice from the middle bedroom saying oh fuck,

7    it's the cops.  When Corporal O'Connor was about halfway up

8    that staircase, gunfire erupted through the middle door of the

9    second bedroom.  One of those bullets hit Corporal O'Connor

10   just under his right arm, just above where his ballistic vest

11   was protecting him, killing him.

12           Hassan Elliott killed Corporal O'Connor that morning

13   by shooting a Mossberg 22 caliber rifle sixteen times.  He

14   emptied every bullet in that gun through a closed middle

15   bedroom door in the direction of those police officers.  You'll

16   hear that Elliott, defendant Jimenez, and defendant Parker,

17   they knew of Elliott's plan to shoot it out with police.  The

18   whole gang knew.  Everybody knew this day would come.  They

19   knew that he was wanted for murder and they knew the plan was

20   to shoot it out with the police when that day came.

21           Now, after Corporal O'Connor was killed, other members

22   of the SWAT team ordered everyone out of that middle bedroom.

23   Eventually, Elliott, Sears -- Khalif Sears, who was also wanted

24   for murder, the same murder that Elliott was wanted for.  Bilal

25   Mitchell, and Sherman Easterling exited that middle bedroom.

1           Members of the jury, you will see exactly what

2    officers found when they went into that middle bedroom.  You'll

3    see that the room was actually smaller than your jury box.

4    About half the size of your jury box here.  A very tiny room.

5    And you'll see that it had -- they found ten guns.  You

6    couldn't take a step in that room without stepping on them.

7    They found hundreds of rounds of ammunition.  They found crack

8    cocaine, marijuana, drug packaging materials, scales, razor

9    blades.  You'll hear that the entire firing power in that room

10   was 175 rounds of ammunition.  That, plus everything you would

11   need to run a drug trafficking business.

12          The evidence will show that those four men in that

13   room had a lot more than just proximity in common.  They were

14   all members of a violent drug trafficking enterprise.  A drug

15   trafficking enterprise that these defendants ran.  Now, people

16   served different roles within that gang, just as enterprises

17   have CEOs, managers, office workers.  The members of SG1700,

18   they have different roles too.  They all work together, though,

19   to ensure the success of their illegal business, their illegal

20   drug trafficking and the rest.  And you'll hear by and you'll

21   know by the end of this trial that Kelvin Jimenez and Dominique

22   Parker, they were the leaders of that group.

23          You'll hear that the enterprise used properties within

24   their territory to package and store their guns.  One of those

25   properties was 1688 Bridge Street where Corporal O'Connor was

1    killed.  You'll hear how defendant Jimenez secured that

2    property.  He secured it so that the enterprise -- the gang --

3    could use that property to store their guns to run their drug

4    trafficking business.  You'll hear how he rented that room from

5    a crack user who lived in the front room of that property, and

6    how the gang paid their rent for that property sometimes --

7    oftentimes -- in crack.

8            You'll hear that SG1700 and its membership, they

9    trafficked more than five kilograms of cocaine into our

10   communities.  Defendant Parker and Jimenez would acquire the

11   bulk crack -- or the bulk cocaine, and they would cook it down.

12   They would break it down into crack.  And then that crack was

13   then broken down again into individual packets so that they

14   could sell them on the streets of Philadelphia.  You'll hear

15   that they gave those individually packaged crack capsules to

16   younger members of the group, who then sold it throughout

17   Frankford.

18           The gang sold in an area that encompasses Frankford

19   Avenue and several blocks that are nearby Frankford Avenue,

20   just around the Frankford Terminal.  Some of you may be

21   familiar with that area, but it's a very busy area.  It's

22   particularly advantageous to drug dealers, and it was highly

23   profitable.

24           You'll hear that the violent reputation -- the gang's

25   violent reputation -- allowed them to exclude rival drug

1    dealers from that very profitable, covetable territory.

2    Members of Members of the enterprise. they proved their loyalty

3    to each other and to the gang in primarily three different

4    ways.  One, by progressively selling larger quantities of

5    drugs.  Two, by committing violent acts against opposing drug

6    gangs.  And three, by not cooperating with law enforcement.

7          SG1700 had two primary drug rivals.  There was a group

8    that is circled in yellow that operates out of the 4800 block

9    of Tackawanna Street.  It's known as Red Brick or the Whitehall

10   housing projects.  Another group was called 5200 Hawthorne.

11   They operated around 5200 Hawthorne Street, where the

12   intersection of Hawthorne and Marlowe Streets.  You'll hear

13   that SG1700 gang members committed murders and shootings in the

14   rival gang territories to protect their reputation for violence

15   and to protect their highly covetable and desirable drug

16   trafficking territory.

17         SG1700 members routinely travel to the Tackawanna

18   projects and to Hawthorne Street to commit murders and

19   shootings.  Sometimes with rival drug gang members, but other

20   times they shot innocent bystanders who were just present in

21   rival gang territory.  They used social media prolifically, and

22   you'll see many social media posts where they bragged about

23   their loyalty to their gang, to one another, and about the

24   shootings and the violent acts that they committed with each

25   other and on behalf of the gang.

1            You'll hear evidence in this case about a number of

2    violent crimes and acts committed by SG1700 members.  You'll

3    hear about the murder of Kaseem Rogers, known as Glizzy.  He

4    was a member of the rival drug trafficking gang that operated

5    out of the 4800 block of Tackawanna Street.  He was killed on

6    December 3rd, 2018, just before 8 o'clock p.m. at the

7    intersection of Tackawanna and Harrison Street.

8            You'll hear that Hassan Elliott, Khalif Sears, and

9    another SG1700 gang member, Chris Addison (ph.), shot and

10   killed Kaseem Rogers while he was standing outside of a corner

11   store with two other individuals.  One woman who was just a

12   member of the community and another one of his fellow gang

13   members.

14           You'll hear that just before that murder, just before

15   his Hassan, Elliott, Bilal Mitchell, and the other SG1700

16   member went to that area, this defendant, Kelvin Jimenez, he

17   went over there.  He drove to that location.  He scoped out the

18   block.  He made sure there weren't any police around and he

19   made sure that there were rival gang members present in that

20   area.  And then he called his young boys, Hassan Elliott and

21   Bilal Mitchell, and he told them that the block is clear.

22   There's no police out there.  And that their targets -- the

23   location of their targets.  And then Hassan Elliott, Bilal

24   Mitchell, and another SG1700 member went over to that

25   location -- to the same location that this defendant relayed to

1    them -- and shot and killed Kaseem Rogers.  You'll hear that

2    after Rogers was killed, his friends and family made a

3    makeshift memorial of sorts at the scene of his killing.  They

4    erected balloons, teddy bears, at the location where he was

5    shot.

6            On January 25th of 2019 at around 5 a.m., Hassan

7    Elliott and Bilal Mitchell went to destroy that memorial.  When

8    they got there, they noticed two individuals were in a car

9    parked just in front of the memorial.  Elliott opened fire and

10   shot at those individuals.  He shot Cyre Soto and Mikael Hogan

11   (ph.), who were just sitting in their car talking to each

12   other.  Soto and Hogan were not affiliated with any rival gang

13   group.  They were just present in rival gang territory.  On

14   March 1st, 2019, at around 12 noon on the 5300 block of

15   Duffield Street, Hassan Elliott and Khalif Sears murdered

16   Tyrone Tyree.  They did it during a botched robbery attempt.

17           Just before the murder, Elliott and Sears were selling

18   drugs in the gang's area when they saw Mr. Tyree flashing

19   around a large sum of money.  They came up with a plan to try

20   to rob him of that money.  They went and they got their guns.

21   But before they did the robbery or tried to do the robbery,

22   they called defendant Jimenez.  They let him know what their

23   plan was, and they let him know that the drug block was going

24   to be occupied, so that he ought to get somebody else to cover

25   for them, because they were going to go do this robbery.  When

1  they attempted to rob Mr. Tyree, he was seated in a car.  He

2  went to put the car in gear shift when he saw the two guys and

3  Elliott and Sears opened fire, killing him.

4       Shortly after the killing, police obtained arrest

5  warrants for Elliott and for Sears.  It appears the gang knew

6  that Elliott and Sears were wanted for murder.  Defendant

7  Jimenez hid Elliott and Sears, first in his own personal

8  residence, a residence that was outside of the Frankford area.

9  But eventually he moved Elliott and Sears to 1688 Bridge

10  Street, where they remained with ten guns and everything you

11  need to run a drug trafficking enterprise in a room rented by

12  defendant Jimenez.  And they stay there until they were

13  arrested on March 13th, 2020.

14       On August 5th of 2019, just after 1:30 p.m., Ruth

15  DeJesus (ph.) was standing outside of her church on the 1600

16  block of Allengrove Street when a stray bullet fired by Bilal

17  Mitchell and another SG1700 gang member, Chris Addison, struck

18  her in the ankle.  They did that while they were shooting at

19  rival gang members in the 4800 Tackawanna territory.  Defendant

20  Parker was the getaway driver for that shooting.

21       On August 20th of 2019, just after midnight, Ricardo

22  Bracero (ph.) was shot while sitting on his porch near the 4800

23  block of Tackawanna Street.  He was shot a total of ten times

24  in the neck, shoulder, forearm, calf, and thigh.  He was shot

25  by defendant Parker and by Hassan Elliott.  You'll hear that

1    Mr. Bracero, like many of the other people you heard about, was

2    not affiliated with any rival gang.  He was just standing on a

3    porch within rival drug gang territory.

4         You'll hear about the killing of Donte Walker, an

5    individual who is a member of the Hawthorne and Marlowe drug

6    gang.  He was murdered on August 22nd of 2019 at about

7    midnight.  He was killed by defendant Parker, Elliott,

8    Mitchell, and another SG1700 gang member, Malik Battle (ph.).

9    In fact, they ambushed Walker while he was sweeping hair up on

10   the corner because he was a neighborhood barber.  He was

11   standing with another woman who was a member of the community

12   and not affiliated with any rival gang.  And she was nearly

13   shot when he was killed.

14        You'll hear about the shooting of Brian Clay (ph.)

15   that occurred on December 6th of 2019 in the early morning

16   hours.  You'll hear that in the early morning hours of that

17   day, defendant Parker, another SG1700 member, Jamal Williford,

18   and Sammy Martinez (ph.), that they went to the Tackawanna

19   projects to shoot at members of the opposition group.  As they

20   made their way through the parking lots of the Whitehall

21   housing project, they heard movement or saw movement in a

22   parked car.  The men then each took positions standing around

23   the car and fired into the car, nearly hitting a man who was

24   named Brian Clay.  Again, unaffiliated with any rival drug

25   group.  Just merely present in opposition territory.

```
 1              On December 20th of 2019 at 3:45 a.m., a woman by the
 2     name of Robin Ferguson (ph.) was driving through the area when
 3     she was just passing Wissinoming Park when her car was shot up.
 4     You'll hear that just before that shooting, defendant Jimenez,
 5     Elliott, Mitchell, Williford and other SG1700 gang members were
 6     going back and forth, which was a common practice for them
 7     fighting with members of the 4800 Tackawanna gang group.  They
 8     made arrangements with that group to meet up and essentially
 9     shoot at each other.  But when they were on their way there,
10     they mistook Ms. Ferguson's car for the car of a rival gang
11     member and opened fire on her.  She had just dropped her
12     boyfriend off at work.
13              On December 27th of 2019 at approximately 12:12 p.m.
14     in the afternoon, Hassan Elliott shot at two Hawthorne Street
15     gang members -- Leroy Hamilton (ph.) and another individual,
16     Gil Thompson, at the corner of Bridge and Hawthorne Streets.
17     Thompson returned fire during this incident, and Richard
18     Rasaldi (ph.), who was an individual that was just again
19     driving through the area unaffiliated with anyone, was caught
20     in the crossfire.  He was shot in the stomach but lived.
21              On January 28th of 2020 at 1:30 a.m., defendant
22     Jimenez, Elliott, Easterling, Mitchell, Sears, and Sammy
23     Martinez, again, went to the 4800 block of Tackawanna Street to
24     shoot at rival gang members.  During the shooting, one of the
25     rival gang members, Malik Mouzone, was grazed in the head.
```

1              As I told you on March 13th of 2020, just after 6

2    a.m., Corporal James O'Connor was killed by Hassan Elliott at

3    1688 Bridge Street.  You'll hear about another shooting that

4    occurred on May 22nd of 2021 at approximately 9:55 p.m.

5    Defendant Parker attempted to shoot at another rival gang

6    member, Bernard Lee (ph.), who was part of the Hawthorne and

7    Marlowe Street group.  He did this after Lee shot and killed

8    SG1700 gang member Laquan Hayes.

9              Now, members of the jury, based on this, the

10   defendants are charged with a number of crimes.  As the judge

11   told you, Count I charges the defendants with conspiracy to

12   participate in the affairs of a racketeering enterprise, also

13   known as a RICO conspiracy.  At the end of this trial, Judge

14   Sanchez will give you very precise instructions on what exactly

15   a RICO conspiracy is.  He'll explain to you that conspiracy is

16   really just an agreement.  It's just an agreement to commit a

17   criminal offense.

18             In a nutshell, our evidence will show that defendant

19   Jimenez and defendant Parker and other members of SG1700 agreed

20   to participate in affairs of a racketeering conspiracy.  That

21   just means a group of individuals associated together, in fact.

22   And that they agreed to conduct multiple acts of racketeering.

23   Now, that's just multiple related crimes involving drug

24   trafficking and murder.  You'll hear that they did this from as

25   early as June of 2019 through May of 2021.

1         Count II charges the defendants with conspiracy to

2    distribute drugs, specifically crack cocaine and marijuana.

3    Now, just like Count I, Judge Sanchez will tell you that a

4    conspiracy involves an agreement.  But let me be clear, ladies

5    and gentlemen, there is no formal contract in this case.  This

6    wasn't a legitimate business, but it's -- they're violent drug

7    dealers.  It just doesn't work like that.  So you won't see a

8    contract.  You're not going to see any signatures on any line.

9    But the evidence will show you, and you'll know by the end of

10   this case, that these were men that were working together.

11   That they were working together to benefit themselves and the

12   group that they were a part of.  Again, it was a coordinated

13   effort with a common goal to sell drugs and to advance their

14   goals of the SG1700 enterprise.

15        The defendants, as the Judge told you, are also

16   charged with murder and assault in aid of racketeering.

17   Dominique Parker is charged with his participation in the

18   killing of Donte Walker and for the shootings of Ricardo

19   Bracero; Ursula Wilson, who was the woman that was standing

20   with Donte Walker when she was killed; as well as the shooting

21   of Bernard Lee.  Defendant Jimenez is charged with for his

22   participation in the murder of Kaseem Rogers and for shooting

23   Jolisa Love and Dajovan Speaks (ph.), who were standing with

24   Kaseem Rogers when he was killed; as well as the shootings of

25   Robin Ferguson, the woman who was driving and had just dropped

1    her boyfriend off at the airport; and Malik Mouzone, a rival

2    gang member who was grazed in the head.

3           Now, to prove this offense, we will show the existence

4    of the SG1700 enterprise and that the defendants committed,

5    attempted to commit, or conspired to commit these crimes of

6    violence to gain entrance to or to maintain or increase their

7    position within that enterprise.  That's a complicated way of

8    saying that the killings or the assaults helped them.  Helped

9    another member or the enterprise as a whole.  You'll hear the

10   defendants are also charged with firearms offenses for the guns

11   that they and their coconspirators used during each one of

12   those offenses.

13          Finally, the defendants are charged with maintaining a

14   drug involved premises for their use of 1688 Bridge Street at

15   the location where Corporal O'Connor was killed.  The location

16   that they used to store their drugs, to package their drugs,

17   and to store their guns.

18          But I want to talk to you now about the evidence.  How

19   are we going to prove this to you?  Members of the jury, you'll

20   hear that after each one of these incidents, police officers

21   responded.  They rendered aid to the shooting victims.  They

22   collected evidence.  They processed the crime scenes.  And

23   you'll hear from each one of those officers.  You'll hear from

24   the officers that responded to those crime scenes.  You'll hear

25   from crime scene officers who collected all of the evidence,

1   inventoried it, and submitted it to the ballistics laboratory.

2        Some of you may be familiar with guns, but when most

3   guns are shot, they eject what's called a fired cartridge

4   casing, and a fired cartridge casing has its own unique

5   imprint.  It's like a fingerprint, and you can compare those

6   guns and those fired cartridge casings to each other.  And

7   you'll hear through the course of this trial that many of the

8   fired cartridge casings collected at the scenes of these

9   offenses came back to the ten guns that were found in the room

10  where Sergeant O'Connor was killed.

11       You'll get to see the guns yourselves.  You'll see the

12  drugs.  You'll see photos of the crime scenes and you'll see

13  all of the drug packaging materials.  The plate, the weight,

14  the razor blades, all the new and unused packaging materials.

15  Everything you need to run a drug trafficking enterprise that

16  they all found within that room in 1688 Bridge Street.  Again,

17  a room half the size of your jury box.

18       You'll hear from the victims.  They'll tell you

19  exactly how everything happened, that they were driving through

20  the neighborhood; that they were standing outside of their

21  church; that they were standing outside of their local corner

22  store when they were shot by either these defendants themselves

23  or members of these defendants' group.

24       You'll hear from the man that rented the room to

25  defendant Jimenez, a man by the name of Vladimir Rivera (ph.),

1    who was suffering from a terrible crack cocaine addiction when

2    he agreed to let the group use his the middle bedroom of his

3    property at 1688 Bridge Street.  You'll hear from Charlene Soto

4    (ph.), who is another individual that stayed at 1688 Bridge

5    Street in the crack ground.  You'll hear that she, too,

6    suffered from a crack cocaine addiction, and that she often

7    bought drugs from these defendants, as well as other members of

8    the SG1700 group.

9          You'll hear from neighbors in the area that will

10   explain exactly how the neighborhood changed once SG1700

11   started to take over.  A (indiscernible) that used to live in

12   that area will come and tell you about how the community went

13   from a place where they had block parties.  They had a real

14   sense of community, to one where neighbors were afraid to go

15   outside because they might be shot as they drove through the

16   neighborhood looking for parking spots or just stood on their

17   own front porch.

18         You'll see social media posts, prolific social media

19   posts, from these defendants, as well as their gang members --

20   their young boys -- where they discuss openly the shootings

21   that they were committing.  They claimed these acts of

22   violence.  This is something that they were proud of because,

23   again, it was a way for them to communicate the domination that

24   they had over this area -- in that particularly profitable drug

25   area.

1          You'll hear admissions in the form of rap lyrics.

2  Many of these social media posts involved a rap video that the

3  gang produced -- that defendant Parker produced -- that

4  features all the people that I just spoke to you about,

5  including defendant Parker and defendant Jimenez.

6          You'll see Defendant Jimenez stand at the location

7  where Donte Walker was murdered, sleeping just as Donte Walker

8  was doing when he was shot and killed by Defendant Parker and

9  other SG1700 members.  You'll see letters and correspondence

10  that were exchanged between SG1700 members.  And you'll hear

11  recordings of SG1700 members discussing their crimes and

12  (indiscernible).

13          You'll also hear about and hear for yourselves in the

14  sense that they were recorded that defendant Jimenez conducted

15  a number of what's called controlled drug buys.  That a

16  confidential informant or source set up drug buys with

17  defendant Jimenez, and that those buys -- the sale of crack

18  cocaine that the confidential source purchased from -- directly

19  from Kelvin Jimenez were recorded and observed by law

20  enforcement.  You'll also hear that defendant Jimenez admitted

21  to those offenses and that he pled guilty to committing those

22  offenses and to selling those that those narcotics to that

23  confidential source.

24          But make no mistake, members of the jury.  This was

25  not some one off drug buy.  This wasn't some independent

1    contractor position that defendant Jimenez was engaged in.

2    Because you'll also hear that prior to engaging in those drug

3    buys, the source attempted to buy from another individual in

4    SG1700, and that only when the source started asking for more

5    quantities of narcotics did he end up being put into contact

6    with defendant Jimenez, who then conducted those sales with the

7    recording.

8         Members of the jury, you're also going to hear from

9    members of the -- members of SG1700 itself.  You'll hear from

10   gang members.  You'll hear from Sherman Easterling, Bilal

11   Mitchell and Jamal Williford.  Williford is actually not only

12   an SG1700 gang member, but he's defendant Parker's brother.

13        Now, I'm going to tell you right now, these people are

14   criminals.  They are drug dealers.  They are members of a

15   violent drug trafficking group, SG1700.  You're going to learn

16   that they are murderers.  But you'll also hear that each of

17   them has accepted responsibility for what they've done.  They

18   pled guilty and they have all agreed to testify.  They've all

19   agreed to come before all of you and testify to the crimes that

20   they committed and to the crimes that they committed with these

21   defendants.

22        You'll learn that part of the reason that they are

23   agreeing to come in here and testify before you is that they

24   hope to receive a lighter sentence.  And that's a decision that

25   ultimately is going to rest with the Judge.  You will get to

1  see the agreements that they signed, and you'll see that as

2  part of those agreements, they have to tell the truth.  If they

3  don't, there's no agreement.  In fact, they could be charged

4  with an additional offense of perjury.

5       Now, the reason that you're going to hear from them is

6  that they're going to be able to give you an inside look at

7  what it was like to be in SG1700.  And the best way to

8  understand that gang is to see it from the inside out.  They

9  will provide you with that opportunity.

10      Keep in mind when they're testifying, that these were

11 people chosen by these defendants.  They were handpicked by

12 these defendants to be part of their gang.  As you listen to

13 the evidence, I want you to keep in mind that this isn't a

14 movie.  This isn't a TV show.  It's not CSI.  You're hearing

15 from real people.  They're not actors and they're here to tell

16 you about real events.  We're going to do our best to do this

17 in chronological order, but in real life, that's not always

18 possible.  So things may come to you a bit out of order.

19      You'll hear about the violent acts that were committed

20 by the gang.  But remember, this isn't a case about an

21 agreement.  This isn't a case about individuals as a whole.

22 This is a case about an agreement to commit crimes.  It's about

23 the enterprise.  It's about SG1700.  We are confident that you

24 will take the necessary pieces and put them together.  Use your

25 common sense.  Each of you were selected yesterday and today

1    because you demonstrated the ability to use your common sense.

2    That's not something you should leave at the door.  That's your

3    most important tool that you should bring to your

4    deliberations.  The law and your common sense will tell you

5    what you already know.  It's a tale as old as time.  One for

6    one; one for all; in for a penny; in for a pound.  However you

7    want to say it, the law reflects exactly what you know.  It's

8    common sense.

9           It's the same principles that you all understand.

10   People are responsible for the actions of the group -- the

11   gang.  The gang that they agreed to join to further, and in the

12   case of defendant Jimenez and Defendant Parker, to leave.  It's

13   called a conspiracy.

14          Now, each of the actions of the gang, they're charged

15   as overt acts of the enterprise.  They're all assigned a number

16   in the superseding indictment, which you'll see.  We

17   coordinated our exhibits to coincide with that, so you'll know

18   exactly which number the evidence relates to.  It's sort of

19   like a table of contents of sorts.  Each one of those overt

20   acts are actions of the enterprise, of the group, of the gang.

21   The gang which these defendants led.

22          Ladies and gentlemen, at the end of this case, you

23   will know beyond any doubt that defendant Jimenez and defendant

24   Parker are guilty of the offense that they are charged with in

25   the superseding indictment.  These defendants were leaders of

1    SG1700.  And after you've heard all of the evidence, the

2    Government will come back to you and ask you to render the only

3    verdict that's consistent with the evidence, with the law, and

4    with your common sense.  A verdict of guilty.

5              THE COURT:  Okay.  Members of the jury, at this point,

6    you heard one-third of the opening statements.  We're going to

7    break for the afternoon break.  I also think that you have --

8    you didn't complete your lunch, so we'll have a fifteen-minute

9    break.  Let me know if you need a little more time.

10             But I wanted to repeat you cannot talk to each other

11   about anything you heard so far and continue to follow my

12   instructions that I gave you just a few minutes ago.  Have a

13   good break.  Hopefully they have the balance of the lunch

14   available, and I will see you about 3:25 to continue with the

15   openings.

16             THE COURT OFFICER:  All rise.

17        (Jury exits)

18             THE COURT:  See you at 3:25 to continue with openings.

19        (Recess at 3:11 p.m., until 3:31 p.m.)

20             THE COURT:  Okay.  You may be seated.  Attorney

21   Fitzpatrick or Attorney Parkinson?

22                     DEFENDANTS' OPENING STATEMENT

23             MR. PARKINSON:  Thank you very much.  May it please

24   the Court, Mr. Fitzpatrick, Government.

25             Good afternoon, Your Honor.  My name is Mike Parkinson

1    and I represent Dominique Parker.  The first thing I want to

2    do, though, is since we're going to be here for a few seconds,

3    and we'll be here together for a little bit of time, is just

4    thank you.  And why I want to do that is because thank you for

5    your time and for your service as jurors.  You're going to be

6    here for a couple of weeks.  So again, thank you.  Thank you.

7    Thank you.

8         The first thing I'm going to do is really kind of

9    start off about -- follow-up about a couple of things Judge

10   Sanchez has indicated before about the law.  The first thing is

11   the fact that I'm talking to you right now.

12        The fact that the Judge is sitting over there and we

13   have the Government sitting over here, and we have some

14   marshals back over there, they don't mean anything.  Okay?

15   They don't mean anything at all.  You said in your head just

16   because we're here right now to affect the case, right?  They

17   are presumed under the law to be presumed to be innocent.

18   Okay?  So at this point, they are one hundred percent innocent.

19        The burden of proof in this case rests on not my

20   shoulders.  It doesn't rest on Mr. Fitzpatrick's shoulders.  It

21   rests on the Government's shoulders.  Okay?  And what that

22   basically means is that we don't have to offer any evidence.

23   We don't have to actually ask any questions.  We don't really

24   have to do anything.  The burden of proof is on them.  More

25   than anything else, what that means is that we don't have to

1    prove their innocence on this case.

2            The burden of proof is on their shoulders. We don't

3    have to ask any questions if we don't want to.  We can sit

4    back.  That's not going to happen, obviously, but again, the

5    burden of proof is on their shoulders.

6            Finally, the burden of proof in this case is called

7    beyond a reasonable doubt.  Judge Sanchez is going to indicate

8    to you in his charge basically what that means, but I'll

9    provide a loose definition, more than anything else is pausing

10   or hesitating or making an important decision in life.  And

11   after this case is done, we will pause, and you will hesitate

12   and the only verdict you would give is going to be not guilty.

13   Because this case is going to come down more than anything else

14   to the witnesses in this case.  And the witnesses in this case

15   in terms of Bilal Mitchell, Sherman Easterling, and Jamal

16   Williford, you will not be able to believe anything they say.

17           You will not be able to trust them.  And they're the

18   ones who are going to be the main persons.  Again, that's going

19   to be the evidence in this case.  And there's going to be a

20   fear that's going to be hanging over.  It's not the fear of

21   God.  It's going to be the fear of a federal sentencing.

22           And what I mean by that is that each and every one of

23   them has been charged federally, and they have this sentence

24   that is going to be hanging over their head, and they have

25   deals with the Government and the person who's going to be able

1    to determine whether they get that deal or not is actually

2    going to be the Government.  So if they don't come in here and

3    testify as to what the Government wants them to testify, they

4    won't get the deal.  So if you think about that for a couple of

5    seconds.  They have to come in.  They have to testify.  The

6    Government are the ones that are going to determine whether or

7    not they are cooperating based on what they want them to say.

8    So if they don't say what the Government wants them to say,

9    they don't get the deal.

10           So think about that for a couple of seconds when it

11   comes to a bias (indiscernible).  And I say this.  Watch out

12   for the lightning bolt.  They put their hands on the body.

13   Because again, because they are going to lie for the sole

14   purpose, more than anything else, for them to get a good

15   offer -- good deal.  And the people, again, who are going to

16   control that is going to be the Government.

17           So again, they have these signed agreements.  They're

18   the ones who control.  They're the ones who are going to be the

19   main, like, evidence when it comes down to this case.  They're

20   the ones because there isn't going to be anything else other

21   than their testimony that's going to implicate our clients.

22           At the end of the trial, (indiscernible) guilty.

23   Thank you.

24           MR. FITZPATRICK:  May I address the jury, Your Honor?

25           THE COURT:  You may.

1            MR. FITZPATRICK:  I did not select you for your common

2   sense.  I selected you because you said that you could be and

3   would be fair.  There's a difference, ladies and gentlemen.

4            My name is Thomas Fitzpatrick.  I represent Kelvin

5   Jimenez.  And unlike what you've heard to this point from the

6   Government, I want to point out something to you.  You recall

7   that Ms. Martin told you that this was not going to be an issue

8   of you deciding for an individual, but for a group of people.

9   But now I want you to think back to the instruction that Judge

10  Sanchez read to you at the beginning of your service, where he

11  read to you that in our system of justice, guilt is a deeply

12  personal and individual thing.  Deeply personal and individual.

13           And so when I tell you that I represent Kelvin

14  Jimenez, that doesn't mean that I'm against Dominique Parker.

15  That doesn't mean that I won't work in collaboration with the

16  Government to present the evidence to you in a way that you can

17  digest it and understand exactly what's going on here.  But

18  what that means is that I respect our system of justice, and

19  you were selected as jurors because you indicated that you did

20  as well.

21           What that means is that our system of justice is an

22  adversarial system.  Mr. Parkinson is right.  We're not going

23  to jump up and down, and we don't have a duty to do so at each

24  and every witness that the Government presents.  We can simply

25  sit back and not question them at all.  You may draw no

1    negative inference from the fact that Mr. Jimenez chooses not

2    to testify or chooses not to give a statement.  None at all.

3    Our system of justice guarantees that.  It demands that of you

4    as jurors.  And we believe that you will indeed sit as jurors

5    and uphold that obligation.

6         But in the presentation of evidence and the

7    presentation of witnesses, you will be required to utilize your

8    common sense at times.  You will be allowed and required to

9    question the credibility of the witnesses that you hear from

10   and the evidence that you hear from the stand throughout the

11   course of this trial.

12        I want to apologize for the glasses thing.  I just

13   went blind about a month ago, and I was told I had to wear

14   these, so sometimes my depth perception is off and I need them

15   and don't need them.

16        But during the opening of the Government, you heard

17   several allegations thrown about regarding Mr. Jimenez, and I'm

18   going to talk to you about three very crucial things as it

19   relates to those.  It's the facts, the law, and the standard.

20   The facts, the law, and the standard.

21        The Government alleges that Mr. Jimenez took part in

22   several different violent activities.  But here's a fact.

23   Although the Government says that after each incident, police

24   officers responded.  After each incident of violence that they

25   told you about.  Mr. Jimenez was never implicated, arrested, or

1  alleged to have been the perpetrator of any of those acts of

2  violence.  None.

3          Despite the fact that after each incident, police

4  officers responded and there was an investigation, and despite

5  the fact that the Government alleges that Mr. Jimenez was the

6  leader of this notorious gang that they speak about, they say

7  that he made calls to his young boys and told them that the

8  coast was clear to come and conduct this shooting -- this

9  killing of one Khaseem Rogers.  That can be their position.

10          Fact.  Show me that call.  They're not going to show

11  you that call.  You know what else they're not going to show

12  you?  They're not going to show you any fingerprints.  They're

13  not going to show you any DNA.  They're not going to show you

14  any video of Kelvin Jimenez participating in any act of

15  violence.  In fact -- in fact, even their star witnesses that

16  Mr. Parkinson just so eloquently talked about and how you view

17  their testimony with a jaundiced eye, and I'm fine with you

18  doing so -- but even those people, none of them are going to

19  come in here and tell you that they ever witnessed Kelvin

20  Jimenez shoot anyone, harm anyone.  None of them are ever going

21  to tell you that he ever gave an order for them to harm anyone.

22  No one's ever going to tell you that he had a beef, that they

23  were settling on his behalf with anyone.  Mr. Jimenez

24  categorically denies participating in any act of violence.  And

25  fact, no one's going to take that stand and say anything

1    different.

2        Now, what I need you to understand, ladies and

3    gentlemen, when I make statements like that -- big, bold

4    statements like that -- is that we have about 600 exhibits in

5    this case, and we've been through many of them.  Many of the

6    witnesses that are going to come before you have testified or

7    have been questioned before and interviewed time and time and

8    time again.  And I'm talking about one, two, three, four, five,

9    six, seven, eight interviews.

10        So could someone get up there and surprise me?

11    Absolutely.  The one thing that I ask you to do is understand,

12    please, I'm not trying to be deceptive.  I could simply be

13    wrong or today could simply be the day that they decide that

14    they remember something that they hadn't remembered in the

15    previous six or seven statements.  I can't know that.  I don't

16    have a crystal ball for that.  But we have to prepare ourselves

17    for that in the trial.

18        So as you prepare yourselves to go through the trial

19    and you think about the about the facts of the case, let's talk

20    about a couple of the other facts that have been highlighted by

21    the Government here.  One is the tragic death of Sergeant

22    O'Connor.  On that day in that house, you recall the Government

23    showed you a slide with six photographs on it.  Only four of

24    those people were at that location.  Mr. Jimenez was not.  Not

25    with Mr. Parker, for that matter.  There were four people at

1   that location.  And the one Hassan Elliott responsible for

2   killing Sergeant O'Connor has pled guilty to that.  And we

3   think that that's appropriate and that's right.  But what's not

4   appropriate, what's not right, is that now the Government wants

5   to bootstrap that guilty plea and that acceptance of

6   responsibility to Kelvin Jimenez who had nothing to do with

7   that incident and with the tragic death of Sergeant O'Connor.

8          And so all this stuff about, well, everyone knew that

9   he was going to shoot it out with the police.  That's

10  ridiculous.  That's why he's sitting in that chair?  That's

11  ridiculous.  So quite frankly, ladies and gentlemen, what we

12  need you to understand is that this is a RICO indictment.  It

13  is Racketeer Influenced Corrupt Organizations.  One of the most

14  powerful tools that our federal government has in its arsenal.

15  But I also need you to have a healthy respect for the immense

16  power of the federal government.

17         And so by illustration, you heard that Kelvin Jimenez

18  has pled guilty to prior instances of drug distribution.  Seven

19  occasions, actually.  Seven occasions in which there were

20  violence conducted by Mr. Jimenez and he pled guilty.  He

21  accepted responsibility for those things.  He accepted

22  responsibility for what he felt Jimenez did, not for anything

23  anyone else did, but for what he did.

24         These investigations, all of these different incidents

25  that the Government has told you about, these are state

1   investigations.  Remember when the Government said you're going

2   to have to put it all together?  Well guess what?  What they're

3   really saying to you is this was never a federal investigation.

4   This was never a federal investigation.  This is not a federal

5   RICO.  This is instead a classic example of overreaching.  And

6   that's what you're going to hear throughout the course of this

7   trial.

8          There are no FBI stings.  That's not what you're going

9   to hear about.  You're going to hear about the cobbled together

10  local police investigations that the Government is now

11  attempting to use as a RICO indictment.  And most importantly,

12  what you should understand -- and here's an illustration of,

13  again, the power of the federal government -- is that those

14  pleas, those guilty pleas that happened in this courtroom

15  before Judge Sanchez on December 14th, 2022, where Mr. Jimenez

16  accepted responsibility for the drug transactions that he took

17  part in, those guilty pleas took place in federal court.  And

18  then three and a half months later, this indictment before you

19  all was brought down in March of 2023.

20         And why is that significant?  That's significant and

21  it's an illustration of the power of the federal government.

22  Mr. Jimenez pled guilty and accepted responsibility for what he

23  had done in drug buys.  And then three and a half months later,

24  the federal government brought down a superseding indictment

25  and accused him of those same drug buys that he's already

1    entered a guilty plea to as over acts in the superseding

2    indictment that is before you now.  It's not illegal.  It's not

3    improper.  It's just another example of the great power that

4    the federal government has.

5            And here's why it's overreaching and here's why you

6    should be concerned.  Ms. Martin told you that this was a drug

7    trafficking operation, and she said that they distributed over

8    five kilos of cocaine.  You are going to hear about seizures,

9    about 280 grams of crack, give or take.  That's about a quarter

10   of a kilo.  That's over a five-year investigation period or

11   indictment period.

12           MR. DIVINY:  I'm going to object, Your Honor.  Can we

13   see you at sidebar?

14           THE COURT:  Well, what the lawyers say in their

15   opening statement is not evidence, so --

16           MR. DIVINY:  Right.

17           THE COURT:  -- so it's not evidence.

18           MR. DIVINY:  Right.

19           THE COURT:  And --

20           MR. DIVINY:  All right.

21           THE COURT:  -- remember when I said openings and

22   closings are not evidence, so you could disregard them if you

23   don't find that it will be introduced in the case.

24           But go ahead.  You may continue.

25           MR. FITZPATRICK:  In the seven buys that Mr. Jimenez

1   conducted, the heaviest weight was 39.4 grams.  Now, there was

2   no large -- you're not going to hear about any large seizure of

3   money.  You're not going to hear about any Ferraris or any

4   boats that were seized from this drug trafficking empire --

5   this enterprise.  You're hearing about a street-level dealing

6   amount of drugs.

7           And so when I say you want to select it for your

8   common sense, common sense should tell you that in the

9   Frankford section of Philadelphia where you have places like

10  the Tackawanna Projects, there might be some drug dealing going

11  on.  There may even be some violence going on.  But being fair

12  means that you will require the Government to prove what it is

13  that they are saying.  So although common sense tells you there

14  may be some drug dealing going on, common sense tells you that

15  there is some violence going on, they have to prove that Mr.

16  Jimenez was involved at all in any of that violence.  They have

17  to prove that there were more than five kilograms of cocaine.

18  They have to prove that to you.  And I just ask that you hold

19  them to their burden.  See, and that's called applying the

20  facts to the law.

21          And then finally, when you hold them to their

22  burden -- and Mr. Parkinson is absolutely correct in this --

23  that burden never shifts.  So getting back to where we began

24  our discussion.  The burden never shifts.  It never becomes

25  ours.  It's never up to me to prove Mr. Jimenez innocent.

1    Because guess what?  Mr. Jimenez is not innocent.  He's pled

2    guilty to distribution of narcotics.  He's pled guilty for what

3    he's done.  But he is most certainly -- most certainly not

4    guilty of the things that they are alleging in this indictment,

5    and they should be required to prove those things beyond a

6    reasonable doubt.  And that is, again, not beyond all doubt,

7    not to a mathematical certainty.  But as my grandmother used to

8    say, I can show you better than I can tell you.  And so they've

9    done a good job of telling you all the things that they think

10   the burden of proof, the standard in our system of justice, in

11   this adversarial system of justice, the standard requires that

12   they show you.  The standard requires that they show you.

13            And so when they tell you that this is this is a

14   racketeering and this is a racketeering enterprise that is

15   distributing drugs and is a drug trafficking, murderous

16   enterprise, well, where were they before the death of Sergeant

17   O'Connor?  You're not going to hear about any federal

18   investigatory techniques that took place dealing with any of

19   those deaths, any of those shootings, any of those drug deals

20   that occurred prior to the death of Sergeant O'Connor.  Not a

21   single one.  And yet they are going to present evidence to you,

22   and you will have the opportunity to examine.  But you are not

23   going to hear that at any point, despite the fact that it's on

24   video -- they got rap videos -- that's not a credit to

25   anybody's intelligence back there.  They got Instagram

1   postings.  Their photographs.

2           Where was the federal government investigating this

3   Racketeering Influenced Corrupt Organization?  They never did.

4   There's a reason for that.  It's not because they decided to

5   give him a pass.  That's because this isn't appropriate.  This

6   is not what the legislative intent of the racketeering

7   influenced corrupt organization statute is here.

8           Mr. Walters (ph.), can I see 54-101?

9           THE COURT:  Mr. Fitzpatrick, lay off the law.  The law

10  is my domain --

11          MR. FITZPATRICK:  Understood.

12          THE COURT:  -- and I don't know what the legislative

13  intent of racketeering has to do with this.  All right?

14          MR. FITZPATRICK:  Thank you.  And ladies and

15  gentlemen, if I ever tell you anything as it relates to the

16  law, as inconsistent with what His Honor tells you, let me be

17  clear.  You go with what the Judge says.  It is what His Honor

18  says that controls the law.

19          This -- you're going to hear from a witness, Randy

20  Updegraff, I believe, is his name.  I'm sure I butchered the

21  last name and I apologize in advance, but you're going to hear

22  from him, and he's going to be a drug expert for the

23  Government, and he's going to talk to you about drug

24  trafficking.  You see all those arrows?  This is from the

25  Government's Exhibit 54-101.  So those arrows representing drug

1    trafficking all across the world.  Those arrows?  That's what

2    we want our FBI chasing.

3            Thank you, Mr. Walters.

4            Not 1700 Scattergood Street, not 270 grams of crack

5    cocaine.  That is not what those arrows represent, ladies and

6    gentlemen.  Again, this is an effort by the Government, an

7    exercise in overreaching, an exercise in the heavy-handed

8    authority of the federal government, and you should be wary.

9    You should be concerned about it.

10            But most important -- most importantly of all, you

11    should be fair in examining this application.  You should be

12    fair in examining the evidence or the lack thereof that will be

13    presented.  And in many ways, a criminal case is kind of like

14    purchasing a used car.  It's not what the used car salesman

15    tells you about the car.  It's what they don't tell you.

16            And so what you're going to hear throughout the course

17    of this trial is that it's not what the Government told you.

18    It's what they don't tell you.  They told you Mr. Jimenez

19    arranged for 1688 Bridge Street to be used as a drug location.

20    They told you that.  Here's what they didn't tell you.  That

21    gentleman, Vladimir Romero (sic), I believe that's his last

22    name, who they said was the drug user who owned the property

23    where that room was, he doesn't speak English.  So by arranged,

24    what the Government means is that someone asked Mr. Jimenez to

25    translate for him, and that's what Mr. Jimenez did.  That's

1    their witness.  That's not mine.  That's their witness.  He

2    asked Mr. Jimenez to translate for him.  He was looking for a

3    place to stay.  They met with Vladimir, didn't speak English.

4    Mr. Jimenez speaks Spanish.  He asked him to translate.  So now

5    the Government is telling you he arranged for this drug

6    (indiscernible) to be made.

7         So again, ladies and gentlemen, I ask that you do keep

8    an open mind.  Keep an open mind about the evidence.  Keep an

9    open mind about the facts.  Keep an open mind about the law.

10   Keep an open mind about the standard.  I'm not asking you to

11   keep an open mind about whether or not murder is tragic and

12   terrible.  I'm not asking you to keep an open mind about

13   whether or not drugs are a scourge in our community.  I'm

14   asking you to keep an open mind about the presentation of

15   evidence and proof beyond a reasonable doubt.  And after you've

16   done that, I believe that you will find Kelvin Jimenez not

17   guilty.

18         THE COURT:  Thank you, Counsel.  Call your first

19   witness.

20         MS. MARTIN:  Yes, Your Honor.

21         MR. DIVINY:  Your Honor, may we see you at sidebar for

22   a moment, please?

23         THE COURT:  You may call your first witness.  Bring

24   him to the stand.

25         MS. MARTIN:  Your Honor, the Government will call

1    James McKinnies to the stand.

2        (Begin sidebar discussion)

3            THE COURT:  Okay?  Could you speak --

4            MR. DIVINY:  Sure.

5            THE COURT:  -- into the microphone?  And I want to get

6    to the testimony.  You could raise this afterward.  Go ahead.

7            MR. DIVINY:  I'm not going to slow you down, Judge.

8            I'm objecting to counsel's mention regarding Hassan

9    Elliott pleading guilty to the killing of O'Connor.  It's

10    misleading because as this Court well knows having taken that

11    plea, he also pled guilty to conspiracy in two conspiracies

12    with his client.

13            THE COURT:  It was opening statements.  If he's

14    willing to prove them wrong, and (indiscernible) plea

15    agreement.  Okay?

16            MR. DIVINY:  That's why I want to put it in there --

17            MS. MARTIN:  Judge, (Indiscernible).

18            THE COURT:  We're going to put that in there?  That's

19    fine.

20            MR. DIVINY:  All right.  Good.

21            MR. FITZPATRICK:  Judge, I had an objection, actually,

22    initially.  If you want, I can do it --

23            THE COURT:  Do it at the end.

24            MR. FITZPATRICK:  Okay.

25            THE COURT:  Let's swear the witness.

```
 1        (End sidebar discussion)

 2             THE COURT:  Come forward, please.

 3             MS. MARTIN:  Your Honor, may I rearrange the

 4   courtroom?

 5             THE COURT:  You may.

 6             MS. MARTIN:  Thank you.  No, I don't need to.

 7             THE COURT:  Would you remain standing?

 8             THE CLERK:  Would you please raise your right hand?

 9              GOVERNMENT'S WITNESS, JAMES MCKINNIES, SWORN

10             THE CLERK:  Please state your name for the record.

11             THE WITNESS:  James McKinnies.

12             THE CLERK:  Please spell the last name, please.

13             THE WITNESS:  M as in Mike, C-K-I-N-N-I-E-S.

14             THE COURT:  Thank you very much.  Adjust the mic.

15   Thank you.

16             MS. MARTIN:  Sure.  That'll work.  It'll do for now.

17                        DIRECT EXAMINATION

18   BY MS. MARTIN:

19   Q.  Good afternoon.

20   A.  Good afternoon.  Could you please state your name for the

21   record?

22   Q.  Sure.  James McKinnies.

23   A.  And Mr. McKinnies or Agent McKinnies, what do you do for a

24   living?

25   Q.  I am a special agent, certified fire investigator for the
```

1    Bureau of Alcohol, Tobacco, Firearms, and Explosives.

2    Q.   Okay.  And where are you currently stationed?

3    A.   Baltimore, Maryland.

4    Q.   You said your title is senior special agent and certified

5    fire investigator?

6    A.   Yes.

7    Q.   How long have you had each of those roles with ATF?

8    A.   I've been an agent with ATF for going on eighteen years

9    now.  I've been a certified fire investigator since 2014, so

10   eleven years with that one.

11   Q.   Can you briefly explain, for the ladies and gentlemen of

12   the jury, what it is that you do in each of those roles?

13   A.   As a special agent, we focused on investigations of

14   prohibited persons, mostly convicted felons, who are in

15   possession of firearms.  As a certified fire investigator, I

16   would investigate fires at commercial structures or religious

17   houses of worship or maybe fires that involved destructive

18   devices.

19   Q.   And prior to your time at ATF, what did you do?

20   A.   I served four years in the United States Secret Service

21   Uniformed Division in Washington DC, and four years with the

22   United States Marine Corps Reserves as a military police

23   officer.

24   Q.   Are you assigned to a specific group within ATF?

25   A.   I am.

1  Q.  And what is that?

2  A.  I am a full-time member of the ATF's National Response

3  Team.

4  Q.  What is the National Response Team?

5  A.  It's a group within ATF that will assist state and local

6  fire and explosive investigators that have scenes that are

7  beyond their capabilities.  So think about a large, you know,

8  Amazon warehouse burning to the ground or a significant event

9  that just -- that local can't handle that investigation on

10  their own, so our team will come up and help them.

11  Q.  And do you have any specialized -- do you have a

12  specialized role even within that NRT team?

13  A.  As a full-time member of that team, I am trained on

14  numerous ways of documenting scenes, so that's going to include

15  making the forensic diagrams or scene diagrams using survey

16  equipment.  We'll use photography like regular still images or

17  360 cameras.  We'll use laser scanners to do 3D models.  We'll

18  use UASs or unmanned aerial systems or drones to take video --

19  to take photographs also and do some modeling.

20  Q.  Is it fair to say -- you mentioned that you normally

21  respond to large scale events as they're happening.  Is it fair

22  to say that your role in this case is a little bit different

23  than that?

24  A.  Yes, this was a little different than normal fire and

25  explosive scenes we go to.

1    Q.   Right.   Here, were you asked by ATF Philadelphia to

2    photograph and document various locations in and around

3    Frankford that are relevant to this case and create a

4    presentation for this jury?

5    A.   Yes.

6    Q.   And to be clear, you weren't out at the scene when these

7    events happened, but you have ingested -- you've taken the

8    photographs and the videos that come from those events, and

9    you've ingested it into this presentation for the jury; is that

10   right?

11   A.   Yes.   Our team came up in November of last year to document

12   scenes, and then we also provided a lot of photographs and

13   videos from the actual case itself.   But our team only came in

14   November and was at numerous locations in Philadelphia.

15   Q.   Can you please explain exactly what it was that you and

16   your team did at those different locations?

17   A.   We had a five-person team arrive up here, and we had

18   designated locations that they wanted us to document.   So we

19   were sent out to, I think, six or seven or eight different

20   addresses, and then we did mostly 360 photographs of the

21   intersections in the streets to document the locations

22   themselves in order to later create a presentation that we can

23   upload into it photo albums and videos from the case itself.

24   Q.   And when we're talking about 360-degree cameras, is it

25   similar to, for example, what Google Maps uses?

1    A.   Yeah.   If you go into Google Earth or Google Maps and do

2    the street view, it'll drop you down on a road and you and you

3    kind of go 360 around, up, down, left, and right.   So our

4    cameras do the same thing.

5    Q.   And you mentioned that you used UAS?

6          THE COURT:   Juror No. 7, can you see him?   Okay.

7    Thanks.

8    A.   Sorry.   Repeat.

9    Q.   Agent McKinnies, you mentioned that you also used UAS

10   footage or there's UAS footage in the PowerPoint.   What do you

11   mean by that?

12   A.   It's a drone.   We flew a drone over certain portions of

13   Philadelphia to take video of alleyways and street ways.

14   Q.   Specifically, were those alleyways that were otherwise

15   difficult to access or difficult to view on a map or from an

16   aerial photo?

17   A.   Yes.   If you're in, like, Google Maps you probably just see

18   the entrance to these walkways or ways.   So from above you can

19   actually see behind houses, parking lots, and things like that.

20   Q.   And you were operating one of the drones that day?

21   A.   Yes.   I was the only one who flew the drones that day.

22   Q.   And you mentioned the ATF and others on the team then

23   provided you with crime scene photographs and videos from each

24   of the overt acts in this case, or the shooting and shooting

25   and murder events; is that right?

1  A.  Yes.  I received photos and videos.

2  Q.  Did you alter the content of those photos or videos in any

3  way, outside of changing the file types so that it would go

4  into the presentation?

5  A.  No, just file types were adjusted to adjust to the

6  presentation itself.

7  Q.  Okay.  And is this the presentation marked as Government's

8  Exhibit 50 and what appears on the screen, though it blank?

9  A.  Yes.

10  Q.  Do you believe this presentation will assist the jury in

11  understanding the locations where these crimes occurred?

12  A.  I do.

13       MS. MARTIN:  Your Honor, the Government moves to the

14  admission of Exhibit 50.

15       THE COURT:  Defense counsel had an opportunity to see

16  the exhibit?

17       MR. FITZPATRICK:  Yes, Your Honor.

18       THE COURT:  Any objection?

19       MR. DIVINY:  No, Your Honor.

20       THE COURT:  Submitted.  You may publish it.

21       MS. MARTIN:  Thank you, Your Honor.

22  BY MS. MARTIN:

23  Q.  Agent McKinnies, would it help if I handed you a wireless

24  mouse so that you could run through the presentation?

25  A.  Yes, it would.

1          MS. MARTIN:  Your Honor, may I approach?

2          THE COURT:  Yes, you may.

3          MS. MARTIN:  I'm handing the witness the mouse.

4          THE WITNESS:  Thank you.

5    BY MS. MARTIN:

6    Q.  Agent McKinnies, can you show us how this presentation

7    works?

8    A.  So the point of these presentations are to just take our

9    scene and bring it into a room, a briefing, or wherever.

10   (Indiscernible), like, a virtual reality tour.  So if every one

11   of these things in the upper bar I put in this presentation, if

12   you hover over them, they'll give you some dropdowns.  These

13   little map icons, you hover over them, you see individual

14   scenes overall.  So the purpose of this presentation is to kind

15   of bring you into the scenes we went to.

16   So this first one here is an overall map in Philadelphia when

17   she mentioned that we were brought up to document scenes.  All

18   these blue dots is where are where we were told to go take

19   photographs from.  So you've got --

20   Q.  To interrupt -- I apologize.  But this is a map of the

21   Frankford section of Philadelphia?  Just to orient the jury.

22   A.  Yes.  I'm not from Philly, so I'm sorry, a I apologize for

23   the accent sometimes.  I'm from Boston.

24   Q.  Well, for example, Agent McKinnies, could you jump into the

25   blue dot at the top that near the Frankford Transportation

1    Center --

2    A.   Okay.

3    Q.   -- and could you turn to your right?  It's just to orient

4    the jury.  On the map there, that's the Frankford

5    Transportation Center on the upper lefthand quadrant of the

6    map.  I apologize, Agent McKinnies.  Please continue.

7    A.   So this is -- I was talking about the 360 image.  So our

8    group went out.  I guess you can see the shadow down here of

9    the tripod with the camera on it, but you can kind of scroll

10   left, scroll right up, down and kind of bring you into the

11   world we were in that day.

12   Like I mentioned earlier, the prosecution provided me with

13   photographs to put in here.  So anytime you see one of these,

14   you can highlight over it.  It's an album.  So if I click on

15   it, photos they provided me will be in there.  You can see the

16   map on the bottom right.  There's this little highlighted blue

17   area.  It's kind of showing the direction that you're facing.

18   Sometimes it can be disorientating if you're in an image like

19   this to kind of scroll left and right and not know where you

20   are in the map you're facing.

21   You can start walking around the neighborhood if you if you so

22   choose.  So this little guy will take me here.  That's the end

23   of that one.  But if you really want to go down this street to

24   the left, go back to the intersection, scroll left.  If I want

25   to, I can just walk down the street, all the way down.

1    Eventually, we'll get to this little blue dot here.  Each one

2    of these blue dots is a location.  You can see by the radar on

3    it facing down the street.  If I turn to the right, the radar

4    turns to the right.  So each one of these blue dots, you would

5    jump to a different location.

6    All the red dots are photo albums that were provided to me.

7    All the green dots are videos provided to me.  So if I scroll

8    to this section here, I incorporated the photo albums.  So you

9    click on the photo album.  It pops up and you can scroll

10   through.  If you want to watch a video, you can click on the

11   video.  And the point was to kind of give people perspective of

12   where they are when these photographs were taking or the video

13   was taken, so it kind of puts you into the scene.

14   And from here you can, you know, close this out if you want

15   more.  Viewing, take it out.  From here you can pick different

16   locations.  Like I said earlier, we had that overall map here.

17   So if you want to go a different one, you can click any one of

18   these little blue locations and go.  You know, highlight one of

19   these.  The red ones, like I said, are photo albums.

20   Q.  Agent McKinnies, could you show the jury the main locations

21   of the area of 1700 Scattergood or starting with Bridge and

22   Hawthorne?  The overall map there in the bottom right where you

23   just clicked.  This is now looking down 1700 Scattergood.  I

24   apologize.

25   A.  Well, I changed.  You want Scattergood?

1  Q.  Yes, please.

2  A.  Okay.  So this is looking -- you can see by the radar here.

3  It's pointing down Scattergood following my mouse down the

4  street.  So if we want to, we can just walk down the street.

5  And each one of these a 360 image taken by a camera.  There's

6  like a dozen of them to get down the road because we wanted to

7  make sure if we wanted to go left or right, it captured things

8  accurately.

9  Q.  And then, Agent McKinnies, can you explain what the

10 helicopter-like icon is in the bottom right map?

11 A.  Yeah, so there are three of these UAS icons.  If you click

12 on any one of them, it'll give you the video I shot with the

13 UAS or drone.

14 So back to the original question about some of these alleyways

15 in between structures.  So to the left here, you can see this

16 little alleyway where a person could walk through with the

17 backyards.  So with the UAS we can get above it and film

18 straight down so you can see what that looks like, versus

19 Google Maps that kind of do it from the side of the road.  So

20 again, each one of these is a different flight I made with the

21 UAS.

22 Q.  Again, these were at the direction of ATF Philadelphia?

23 A.  Yes.  When our team arrived, you know, we didn't

24 investigate this case.  We just came up and were given

25 locations to document and then video -- or place to video.

1        MS. MARTIN:  I have nothing further for this witness,

2   Your Honor.

3        THE COURT:  Okay.  Any questions, Attorney Parkinson?

4        MR. PARKINSON:  Just very briefly, Judge.

5        THE COURT:  Okay.

6                     CROSS-EXAMINATION

7   BY MR. PARKINSON:

8   Q.  Agent, good afternoon.  How are you?

9   A.  Doing well, sir.  How are you?

10  Q.  Pretty good.  Just ask you one question.  So who provided

11  you actually with the stuff for your presentation?

12  A.  So the photo albums and videos?

13  Q.  Yeah, (indiscernible) --

14  A.  The prosecuting office.  The U.S. Attorney's Office

15  provided me the photographs and videos.

16  Q.  Okay.  So just people from the U.S. Attorney's Office,

17  correct?

18  A.  For the -- yes.  All the icons you saw that were albums and

19  the little icons of videos, those are all provided by the U.S.

20  Attorney's Office.

21       MR. PARKINSON:  Okay.  I don't have anything else.

22  Thank you.

23       THE COURT:  Attorney Fitzpatrick?

24       MR. FITZPATRICK:  Yeah, Your Honor.  Briefly.

25       THE COURT:  Yes.

```
 1

 2                         CROSS-EXAMINATION

 3   BY MR. FITZPATRICK:

 4   Q.  Agent, I believe you testified to this, but your

 5   involvement is after all of these alleged occurrences took

 6   place; is that right?

 7   A.  Yes.  Our team came up in November of 2024 like three

 8   months ago.

 9   Q.  Okay.  So that was the extent of your involvement?  No

10   investigation prior to?

11   A.  No.

12   Q.  Thank you.

13            MR. PARKINSON:  I apologize, Judge.  Can I just

14   follow-up on one thing?

15            THE COURT:  Go ahead.  You may.

16                         CROSS-EXAMINATION

17   BY MR. PARKINSON:

18   Q.  When we see that one with the -- I guess, the video of the

19   drone that's coming on, we see some live action there, right?

20   A.  Yes.

21   Q.  That's just actually when you're taking the actual video at

22   that point, correct?

23   A.  Yes.  It was during the middle of the day and you'll

24   probably see me holding the controller that flies over my head

25   at some point.  So that's usually my team out there is what
```

1   you'll see.  We're just regular people.

2   Q.  So it's not like happening when these alleged crimes occur.

3   It's just when you were out there taking the pictures of --

4   A.  No.

5   Q.  -- like the --

6   A.  Nope.

7   Q.  Okay.

8   A.  There's three UAS videos.  All those videos were taken by

9   me after all these alleged crimes.  And then all the blue dots

10  are photographs my team took.  So ted dots and green dots are

11  provided by U.S. Attorney's Office.

12  Q.  Awesome.  Thank you.

13              THE COURT:  You don't have any redirect, do you?

14              MS. MARTIN:  No, I don't, Your Honor.

15              THE COURT:  Thank you for your testimony.  You're

16  excused.

17              Call your next witness.

18              MS. MARTIN:  Your Honor, the Government calls Special

19  Agent Ryan Rooney to the stand.  Your Honor, if I may just

20  switch out the tech.

21              THE COURT:  You may.  Remain standing.  He's going to

22  swear you in.

23              THE CLERK:  Please raise your right hand.

24                GOVERNMENT'S WITNESS, RYAN ROONEY, SWORN

25              THE CLERK:  Please state your name for the record.

```
 1                THE WITNESS:  Ryan Rooney.

 2                THE CLERK:  Thank you.  Could you spell your last

 3   name, please?

 4                THE WITNESS:  Yep, R-O-O-N-E-Y.

 5                THE CLERK:  Thank you.

 6                MS. MARTIN:  Court's indulgence, Your Honor.

 7                THE COURT:  Can the last juror see the witness?  Okay.

 8   Thanks.

 9                MS. MARTIN:  May I proceed?

10                THE COURT:  You may.

11                THE COURT:  Thank you.

12                          DIRECT EXAMINATION

13   BY MS. MARTIN:

14   Q.  Good afternoon, Agent Rooney.

15   A.  Good afternoon, Ms. Martin.

16   Q.  Agent Rooney, can you tell the ladies and gentlemen of the

17   jury where you're currently employed?

18   A.  Yes, I am employed by the Bureau of Alcohol, Tobacco,

19   Firearms, and Explosives.

20   Q.  And how long have you been employed in that capacity?

21   A.  Coming up on twelve years.

22   Q.  Can you describe your training for the jury?

23   A.  Yes.  Our training consists of sixteen weeks down in

24   Glynco, Georgia.  We go through criminal investigator training

25   and we also go through special agent training.
```

1   Q.  What was your educational background prior to becoming a

2   law enforcement officer?

3   A.  I have my bachelor's in criminal justice, and I have my MBA

4   in international business.

5   Q.  And are you an ATF agent currently assigned to Group VII?

6   A.  Yes, I am.

7   Q.  What is Group VII?

8   A.  Group VII -- we are a violent crime group.  So what that

9   means, basically, is we investigate federal violations of, most

10  of the time, firearms.  But what that means is it's anything

11  that can involve violent crime.  So that could be robberies,

12  murders, shootings, kidnappings, carjackings.  And then

13  occasionally due to the fact of it, drugs do come into play

14  because drugs and guns go together.

15  Q.  And what are your duties and responsibilities as it relates

16  to those cases?

17  A.  My duties and responsibilities are to investigate those

18  cases and develop evidence to charge.

19  Q.  Do you have any other auxiliary duties with ATF?

20  A.  Yes.  My auxiliary duties, actually, like you just heard,

21  I'm part of the National Response Team as well.  I'm just a

22  just a part-time member, though.  So as you heard, he's a

23  full-time member.  I'm just a part-time.  So occasionally

24  throughout the year, I go to national events that happen across

25  the country and assist.

1    Q.   Throughout your experience as an ATF agent, have you come

2    to learn and utilize various investigative techniques?

3    A.   Yes.

4    Q.   Can you describe some of those techniques that you have

5    come to learn and utilize specifically as it relates to this

6    case?

7    A.   Yeah.   Interviewing victims, witnesses, different things

8    like that.   There's forensic evidence.   There's electronic

9    surveillance, confidential informants, historical evidence.   I

10   mean, undercovers, different things like that.

11   Q.   You mentioned historical evidence.   Is it common practice

12   in your duties and responsibilities as an ATF agent to review

13   state and local cases that have happened previously that have

14   been investigated previously and then to continue with the

15   federal investigation related to those actions?

16   A.   Yes.

17   Q.   Do you have experience in debriefing individuals who have

18   been charged with crimes?

19   A.   Yes.

20   Q.   And in this case, were the following techniques also used:

21   consensually recorded calls and meetings with Mr. Jimenez and a

22   confidential informant?

23   A.   Yes.

24   Q.   And the controlled buys -- the controlled buys of drugs.

25   A.   Yes.

1    Q.  Was that also used?  And were there federal search warrants

2    in this case for cell phones, for social media accounts, things

3    of that nature?

4    A.  Yes.

5    Q.  As well as state and local warrants?

6    A.  Yes.

7    Q.  In this case, did ATF also utilize a covert listening

8    device?

9    A.  Yes, we did.

10   Q.  And will the jury hear that covert listening device, along

11   with the agents that actually participated in installing the

12   device.  Will they hear from them later during this trial?

13   A.  Yes, you will.

14   Q.  Agent Rooney, have you become familiar with various

15   controlled substances in your career?

16   A.  Yes.

17   Q.  What are those substances?

18   A.  Mainly it would be cocaine, crack, heroin, fentanyl, and

19   marijuana as well.

20   Q.  Have you also become familiar with the various methods used

21   by drug traffickers to manufacture, package, and distribute

22   controlled substances?

23   A.  Yes.

24   Q.  As part of your duties and responsibilities, have you

25   investigated racketeering crimes and organizations that engage

1  in racketeering crimes?

2  A.  Yes.

3  Q.  What are some examples of those racketeering crimes as it

4  relates to this case?

5  A.  Racketeering crimes, they could be associated with drug

6  trafficking, murder, and then another one is -- it's -- they

7  call it VICAR, which is Violent Crime in Aid of Racketeering,

8  which basically means, like, a shooting or a nonfatal shooting.

9  Q.  And based on your experience investigating drug

10  conspiracies and racketeering conspiracies, what can you tell

11  us about these types of investigations?  How do they start?

12  A.  Well, there's two different ways that they mostly start.

13  It's proactive or like a retroactive reactive kind of case.

14  The proactive side would be situation where we have a

15  confidential informant or we have an undercover and we are

16  actively buying guns or drugs off of individuals.  And you're

17  working it that way and building a case.

18  The other way is like -- is a historical case.  So usually with

19  a historical case, there's a catalyst type of an event that

20  starts an investigation.  And when a catalyst event happens

21  like that, and you look back and you look historically to see,

22  kind of, what was going on before.

23  Q.  And what kind of investigation was this?

24  A.  This was a historical investigation.

25  Q.  Was there also an aspect that was proactive as it relates

1   to a different group within ATF?

2   A.  Yes.  In 2019, there's a different group.  It's Group VI.

3   They focus a lot on drug trafficking.  They got a call from the

4   15th District of Philadelphia Police Department about a --

5              MR. PARKINSON:  Objection.

6              THE COURT:  State your ground.  Please stand.

7              MR. PARKINSON:  Sorry, Your Honor.

8              THE COURT:  State your ground.

9              MR. PARKINSON:  Hearsay.

10             THE COURT:  Your response?

11             MS. MARTIN:  Your Honor, it's background.  He goes to

12  why they started investigating in the 15th District.  We can

13  keep it general.

14             THE COURT:  Very well.  Keep it general.

15  BY MS. MARTIN:

16  Q.  First of all, Agent Rooney, you said the 15th District.  Is

17  that in -- where is the 15th District in Philadelphia?

18  A.  In the Frankford area.

19  Q.  And is the 15th District where -- the police district where

20  1700 Scattergood, 1700 Brill, 5300 Lesher, where those streets

21  are located?

22  A.  Yes.

23  Q.  And at some point, did ATF receive information from the

24  15th District related to violence in the area and ask for

25  assistance?

1    A.  Yes, they did.

2    Q.  Now, the Group VI investigation, this is different than

3    your investigation.  When did that begin?

4    A.  2019.

5    Q.  And to be clear, that was before the murder of Sergeant

6    O'Connor; is that right?

7    A.  Yes.

8    Q.  And that's when the drug purchases were made from Kelvin

9    Jimenez?  Before Sergeant O'Connor was murdered?

10   A.  Yeah, I believe they started in November -- no -- October

11   of 2019.

12   Q.  Okay.  And when did you get involved and when did your

13   group get involved?

14   A.  Our group got involved after the Sergeant O'Connor was

15   killed in the line of duty.  Our group got involved then I was

16   assigned later on.  I was assigned in September, but after the

17   fact officially.  But it was in my group to begin with after

18   the Sergeant O'Connor was killed.

19   Q.  What's the difference between your group and the drug

20   group?

21   A.  Just the main difference is they focus on, like, a lot of

22   the drug trafficking.  And again, we focus on violent crime.

23   Q.  And what was ATF's role in the investigation initially

24   after Sergeant O'Connor was killed?

25   A.  Initially after Sergeant O'Connor was killed, we were

1    assisting with homicide with the Philadelphia Police

2    Department.  That's a pretty common thing we assist with,

3    especially anytime an officer is killed in the line of duty.

4    Also, any time that there's that amount of guns recovered in a

5    location.

6    Q.  That amount of guns, you mean the ten guns recovered in

7    1688 Bridge Street?

8    A.  Yes.

9    Q.  You said your initial mission was to support the local task

10   force?

11   A.  Yes, initially.

12   Q.  What was the local task force doing at that time?

13   A.  They were looking at the ballistics from the guns in the

14   room as well.  They were looking into the different homicides

15   that have occurred involving this gang and the different

16   shootings that this gang was involved with.

17   Q.  And why was it that this turned into a federal

18   investigation or -- strike that.  Did this turn into a federal

19   investigation when you and your team discovered the breadth and

20   depth of the violence that was occurring in the 15th District?

21            MR. FITZPATRICK:  Objection.

22            THE COURT:  Sustained.  Rephrase the question.

23   BY MS. MARTIN:

24   Q.  Agent Rooney, when was it that this turned into a federal

25   investigation as it relates to the violence in the 15th

1  District?

2  A.  The initial indictment was in November of 2020, so but

3  we -- we obviously before that.  So shortly after O'Connor once

4  it was realized the amount of violence that this gang was

5  involved in.  The federal Government and the ATF specifically

6  got involved to assist and then eventually take over and run

7  this investigation.

8  Q.  And I want to get to -- I'll get to the initial charges and

9  then the secondary charges.  But I want to explain a couple of

10  these investigative techniques so the jury understands them.

11  We've talked about search warrants, but can you explain what a

12  search warrant is generally?

13  A.  Yeah, a search warrant is written by an affidavit, and it's

14  establishing probable cause to search a certain item.  For

15  example, it could be a house.  It could be a phone.  It could

16  be an iCloud.  It could be a social.  It could be a Facebook or

17  Instagram.  It could be numerous things, but it's a warrant

18  that's written, that's signed off by the judge that establishes

19  probable cause to search that.

20  Q.  And in this case, is there evidence that was seized and

21  search warrants obtained, both local search warrants, state

22  search warrants, as well as federal search warrants?

23  A.  Yes.

24  Q.  Hundreds of warrants in this case?

25  A.  Yeah.  I don't know the exact amount, but.

1    Q.  And what about cell phone records?  Did ATF obtain cell

2    phone records or did you review cell phone records that were

3    obtained by local law enforcement?

4    A.  Yeah, they call them CDRs, or call detail records.

5    Q.  And did you obtain call detail records from Kelvin Jimenez

6    and from Dominique Parker at different points?

7    A.  Yes.

8    Q.  And will the jury hear an analysis of those call detail

9    records?

10   A.  Yes.

11   Q.  What about examination of the contents of cellular devices?

12   Was that done in this case?

13   A.  Yes.

14   Q.  Where did those different cell phones come from?

15   A.  Different parts of the investigation, but there was eight

16   cell phones recovered in 1688 Bridge the day Sergeant O'Connor

17   was murdered.  And again, warrants were done on those -- search

18   warrants were done on those phones.  And then they eventually

19   get what we called as dumped or downloaded.

20   Q.  Can you explain more about that?  What do you mean by the

21   contents of the phone were downloaded?  How are they analyzed?

22   A.  So they get -- they get downloaded and they get put onto a

23   system.  Obviously, I don't do this specifically, but then the

24   results come to me, and they put it on a system that's called

25   Cellebrite, which makes it just basically readable from when

1  they download the phone, and it gives you something that you

2  can look at and read and go through.

3  Q.  And you mentioned the eight cell phones in 1688 Bridge

4  Street, but were there also phones that were recovered from Mr.

5  Jimenez at different points?

6  A.  Yes, there was.

7  Q.  What about social media accounts?  Did you or your team

8  review social media accounts in this case?

9  A.  Yes.

10  Q.  And who did they relate to?

11  A.  Well, they're related to Dominique Parker, Kelvin Jimenez,

12  and other SG1700 members.

13  Q.  And how is it that you get -- I'm talking specifically when

14  I say social media, I'm really talking about Instagram in this

15  case.  How is it that you obtain the contents of these

16  individuals' Instagram accounts?

17  A.  So a search warrant is written and signed off on the judge,

18  and then we would send it to Instagram, which is owned by Meta,

19  which owns Facebook.  So it goes to them.  They're able to work

20  their magic, whatever they do.  And then they send it to us.

21  And then again, it gets put onto the same type of reader,

22  Cellebrite reader, which is just a system that puts it so it's

23  readable for us.

24  Q.  And again, the jury is going to hear from individuals or

25  yourself about the analysis of these different social media

1    accounts, these different cell phones.  And then I'd also like

2    to talk to you about iClouds; is that right?

3    A.  Yes, that's correct.

4    Q.  What is an iCloud account?

5    A.  iCloud is for people that have the Apple iPhones.  For

6    example, if you're backing it up to iCloud, you could still

7    delete stuff off your phone, but it may still be on your iCloud

8    if it's backed up.  So your iCloud is just a cloud server that

9    holds information from your Apple iPhone that may not even be

10   on your physical phone.

11   Q.  And were there numerous iCloud accounts that were obtained

12   in this case?

13   A.  Yes.

14   Q.  And was that also via local and federal warrant?

15   A.  Yes.

16   Q.  Can you explain more about the covert listening device?

17   What was it and where was it placed?

18   A.  The listening device was placed -- and the Bureau of

19   Prisons assisted us -- it was placed in the Bureau of Prisons

20   cell between Dominique Parker and Hassan Elliott's cell.

21   Q.  And does this covert listening device, did it record

22   conversations that occurred between Dominique Parker and Hassan

23   Elliott?

24   A.  Yes, it did.

25   Q.  And again, will the jury hear those for themselves and see

1    transcripts of those conversations?

2    A.  Yes, they will.

3    Q.  We also mentioned earlier you said historical evidence,

4    that it's common in your work as a violent crime investigator

5    to review historical cases.  What exactly does it mean and how

6    extensive was it in this case?

7    A.  As you saw by the opening, it was very extensive in this

8    case.  But what was the other question about other than

9    extensive?

10   Q.  What does it entail?  So you've got the paperwork from a

11   local case, but then what do you do with that paperwork?

12   A.  So yeah, most of them in this situation were if -- I mean,

13   a common term would be cold case or unsolved crimes or

14   shootings or murders.  So we would collect all the paperwork,

15   we would review it, and then obviously we would investigate it

16   further and develop more of our own evidence to help -- or to

17   try to solve these crimes.

18   Q.  And as part of your review of those cases, did you meet

19   with the assigned investigators for those shootings and

20   homicides?

21   A.  Yes.

22   Q.  And did you meet with shooting victims and families of the

23   decedents in these cases?

24   A.  Yes.

25   Q.  What role have ballistics comparisons played in this

1    investigation?  What the jury is going to hear?

2    A.  It's played a huge role in being able to see the guns and

3    the FCCs, which Ms. Stram mentioned in her opening.  It's a

4    system that ATF has -- it's called NIBIN, National Integrated

5    Ballistics Information Network.  And what it basically means

6    boiled down is it kind of leaves a fingerprint.  So when you

7    have a shooting scene and the police get there, they collect

8    FCCs from the scene.  And what that does then that goes into

9    that network, the NIBIN network.

10   And then say a gun gets recovered later on.  They fire that in

11   a safe -- safe location, obviously.  And they take the FCC from

12   that gun that was recovered and that goes into the system.  And

13   the system ultimately then tell you if the FCC from the

14   shooting scene matches that gun.

15   So it's a fingerprint that's able to relate guns to different

16   shootings and not just FCCs that are found at one scene in

17   FCCs, even though you don't have a gun, they can both put in

18   the system and they can link, meaning that this same type of

19   people or -- or similar people are committing these types of

20   crimes.

21   Q.  I want to break that answer down a little bit.  You were

22   saying FCCs.  What is an FCC?

23   A.  Fired cartridge casing.

24   Q.  Okay.  And you mentioned Ms. Stram's opening, but a fire

25   cartridge casing -- where does it come from and how is it left

1  at a scene?

2  A.  Well, if you have a normal, like, pistol like that

3  obviously revolvers would not leave one because they stay

4  inside the chamber.  But a pistol -- when you fire a pistol, it

5  comes out the ejection port as you're firing, and those, for

6  the most part, usually are left at scenes after the shooting.

7  Q.  So you said that this computer system can then take the

8  evidence that is left at a scene and compare it to either other

9  firearms that are recovered and other scenes.  Am I getting

10 that right?

11 A.  Yeah.  There are firearms or other shell casings, FCCs,

12 that are recovered, yes.

13 Q.  So for example, if I commit a shooting right here -- I'm

14 not committing a committing a shooting.  But for the example,

15 if FCCs are left here and FCCs are left on your chair, someone

16 can then go and compare those two fire cartridge casings and

17 determine that they were fired from the same gun if they were?

18 A.  Yes.

19 Q.  And is it fair to say that there's more than fifteen

20 ballistics comparisons and matches in this case?

21 A.  Yes.

22 Q.  Agent Rooney, how many agencies were involved in this

23 investigation?

24 A.  Obviously, we were involved, ATF.  FBI was involved.  The

25 Secret Service was involved and the Bureau of Prisons were

 1    involved.

 2    Q.  And as well as Philadelphia --

 3    A.  Well, and then --

 4    Q.  -- Police and Homicide?

 5    A.  Yes, obviously, Philadelphia Police was involved as well.

 6    Q.  And did Secret Service also do some of the cell phone

 7    extractions in this case?

 8    A.  Yes.

 9    Q.  Okay.  I want to direct your attention to the murder of

10    Sergeant O'Connor.  You said that's when your group got

11    involved; is that right?

12    A.  That's correct.

13    Q.  You mentioned that there were ten guns in the room and a

14    lot of your involvement related to the ballistics evidence.  Is

15    that fair to say?

16    A.  Yes.

17    Q.  How was it that these guns were recovered and then you

18    determined any information related to them?  Were you able to

19    trace them in some way, or is it this NIBIN system you were

20    talking about?

21    A.  Traces -- traces were done as well, but the NIBIN system

22    was able to link them, the guns found in the room, to different

23    shootings.

24    Q.  And is the jury going to hear from a ballistician who did

25    the physical comparison about the guns in the room?

 1   A.  Yes.  She's going to testify to being the actual --

 2           MR. FITZPATRICK:  Objection.

 3           THE COURT:  Sustained.  That's hearsay.  Rephrase the

 4   question.

 5   BY MS. MARTIN:

 6   Q.  Is it fair to say that a ballistician will be called to

 7   review various types of ballistics evidence in this case?

 8   A.  Yes.

 9   Q.  How was it that this became an investigation about an

10   organization -- about 1700 Scattergood?

11   A.  Like you said, when started working back after Sergeant

12   O'Connor and gathering more and more evidence and realizing the

13   more and more shootings that were involved with these members

14   and then get Instagrams back, and you kind of developed a

15   relationship.  Clothing is big in that, tattoos.  And then,

16   like I said, Instagram where you have the bios where you can

17   kind of represent your gang and let -- let everyone know what

18   gang you're affiliated with.  So it kind of evolved from there.

19   Started with the one event for the violent crime side,

20   obviously, but then worked back with the investigation showing

21   these people kept overlapping at different shootings and

22   murders.

23   Q.  And I'll get to the Instagram post in a moment.  Agent

24   Rooney, when were the initial charges brought in this case?

25   A.  In November 2020.

1    Q.   And who were the individuals that were originally charged?

2    A.   The four that were in the room at 1688 Bridge, which was

3    Sherman Easterling, Hassan Elliott, Khalif Sears, and Bilal

4    Mitchell.

5    Q.   Fair to say that the charges at that point related only to

6    the murder of Sergeant O'Connor and the drug trafficking

7    conspiracy?

8    A.   Yes, only to that.

9    Q.   And were those individuals arrested and taken into federal

10   custody from local custody?

11   A.   Yes.

12   Q.   At the time of that initial indictment in November of 2020,

13   had any members of SG1700 come forward and indicated that they

14   wanted to cooperate with the Government?

15   A.   I'm sorry.  At what point did you say?

16   Q.   At the point that the first indictment came down in

17   November of 2020.

18   A.   Not at first, no.

19   Q.   Okay.  Who was the first individual that came forward in

20   this investigation?  Who was the first SG1700 member that

21   federal law enforcement spoke to?

22   A.   Jamal Williford.

23   Q.   And who is Jamal Williford?

24   A.   Jamal Williford is an SG1700 gang member.  He -- I mean,

25   he's a member of the gang.  And at the time, he was arrested on

1    a separate charge.  And he was interviewed and he's the first

2    one that started to provide the information that you guys will

3    hear about later.

4    Q.  And did there come a point where any other individuals who

5    were part of that original indictment, did there come a point

6    where they expressed interest in cooperating with the

7    Government?

8    A.  Yes.

9    Q.  And how did that work?  Did you and other agents speak to

10   them?

11   A.  Yeah, through a proffer.

12   Q.  What is a proffer?

13   A.  Proffer is a off-the-record debrief or interview,

14   basically, of a defendant at the time.

15   Q.  Off-the-record in what sense?

16   A.  Means that anything that they tell us at that time cannot

17   be used directly against them.

18   Q.  But the actual contents of the proffer and the meeting, are

19   those interviews recorded in the form of some sort of report

20   that's produced by ATF?

21   A.  By a report, yes.

22   Q.  Okay.  And who's present at those meetings?

23   A.  The investigator, either agent -- could be a detective

24   agent, task force officer -- and then it's going to be the

25   defendant, his defense attorney, and then the prosecution --

1    AUSAs.

2    Q.  And as a result of those proffers, some of the people

3    charged in the initial indictment decided to cooperate with the

4    Government?

5    A.  Yes.

6    Q.  Who were those people?

7    A.  Bilal Mitchell and Sherman Easterling.

8    Q.  Did they also enter into cooperation guilty plea

9    agreements?

10   A.  Yes.

11   Q.  And have they pled guilty?

12   A.  Yes.

13   Q.  And they are expected to testify in this case?

14   A.  Yes.

15   Q.  Was there a time where another individual, an incarcerated

16   individual, came to your attention with information related to

17   Kelvin Jimenez?

18   A.  Yes, David Murray (ph.)

19   Q.  And can you just give a brief summary of what it is that

20   Mr. Murray -- what was it that he raised -- strike that.  What

21   was it about what Mr. Murray said came to your attention

22   related to this case?

23   A.  He knew --

24              MR. FITZPATRICK:  Objection.

25              THE COURT:  Very well.  It's a legitimate objections.

1              MS. MARTIN:  Your Honor, if I may --

2              THE COURT:  Rephrase your question.

3              MS. MARTIN:  If I may, I'll ask a leading question.

4              THE COURT:  You may.

5    BY MS. MARTIN:

6    Q.  Is it fair to say that Mr. Murray brought to your attention

7    conversations related to Kelvin Jimenez and Hassan Elliott?

8    A.  Yes.

9    Q.  And Mr. Murray is expected to testify in this case?

10   A.  Yes, he is.

11   Q.  Did these individuals that you met with tell you about

12   additional violent acts that were committed on behalf of

13   SG1700?

14   A.  Yes.

15   Q.  Did they tell you about music videos that were produced by

16   Dominique Parker and others in the gang relating to their

17   crimes?

18   A.  Yes.

19   Q.  And after meeting with these individuals, were you able to

20   locate historical police records related to some of these

21   shootings and homicides that they told you about?

22   A.  Yes.

23   Q.  Were you able to obtain video evidence related to those

24   crimes?

25   A.  Yes.

1  Q.  As well as the ballistics evidence that we just talked

2  about?

3  A.  Yes.

4  Q.  Was there a second round of charges in this case related to

5  the superseding indictment and these two individuals?

6  A.  Yes.

7  Q.  And is that when the RICO conspiracy and the related

8  charges that we're here for were charged?

9  A.  Yes, in March of 2023.

10  Q.  Agent Rooney, I want to talk to you, and I want to see if

11  you can give us an overview of SG1700.  Can you explain to the

12  ladies and gentlemen of the jury, based on your investigation,

13  the origins of this organization?

14  A.  The origins?  So it started technically, I guess, on Lesher

15  Street, which is right -- right couple of blocks over.  Then it

16  branched out into Scattergood Street, which is what SG stands

17  for.  SG1700, 1700 block of Scattergood.

18          MR. PARKINSON:  Judge, I'm going to object.

19  (Indiscernible).

20          THE COURT:  State your ground.

21          MR. PARKINSON:  Judge, I apologize.  Based on hearsay.

22          THE COURT:  All right.  Your response?

23          MS. MARTIN:  Your Honor, he's giving an overview of

24  the investigation as it relates to the territory controlled by

25  these individuals.

1          THE COURT:  Very well.  Overruled.  Permitted.

2    Without telling us content, you could continue.

3    A.  So the -- the group and gang that sold drugs in that area.

4    And obviously, my investigation came that these individuals

5    were committing murders and shootings as well.

6    BY MS. MARTIN:

7    Q.  Agent Rooney, if I could show you a map of the area.

8          MS. MARTIN:  Court's indulgence.  Okay.  I'm placing

9    on the screen what has been marked as Government's Exhibit

10   54-104 -- 50-104.

11         Your Honor, may I approach?

12         THE COURT:  You may.

13         MS. MARTIN:  May I approach?  We have a paper copy of

14   this, Your Honor.  It's not included in the electronic exhibits

15   that Your Honor received.

16         My understanding is that there is no objection to

17   Exhibit 50-104.

18         THE COURT:  Any objection to 50-104?

19         MR. PARKINSON:  5-0?

20         MS. MARTIN:  5-0-104.  It's the PowerPoint I provided.

21   Is that accurate that there's no objection?

22         MR. PARKINSON:  Yeah.  No objection, Your Honor.

23         THE COURT:  It's submitted.  50-104 is admitted.

24         MS. MARTIN:  Missing it on the screen.

25         THE WITNESS:  Yep.

1           THE CLERK:  How is it that I --

2           MS. MARTIN:  I apologize.  The red dots -- how do we

3   clear that?

4           THE COURT:  Hit the corner.

5           THE WITNESS:  You're good.

6           MS. MARTIN:  Okay.

7           THE WITNESS:  You're good.

8           MS. MARTIN:  Can you go ahead and click to the first

9   slide, please, Ms. Stram?

10  BY MS. MARTIN:

11  Q.  You mentioned earlier -- we'll get to the map in a second,

12  Agent Rooney -- but you mentioned earlier that this has to do

13  with different street names.  This is a street-level gang; is

14  that right?

15  A.  Yes, that's correct.

16  Q.  Okay.  And what are we looking at in terms of the two

17  different kinds of street signs that are pictured there?

18  A.  The street signs are showing the streets of -- in their

19  area of control.

20  Q.  And do these come from different rap videos that are

21  produced by the gang?

22  A.  Yes, they did.

23  Q.  Okay.  And these are streets in the Frankford section of

24  Philadelphia?

25  A.  Yes.

1    Q.  And then what's pictured on the righthand side there?

2    A.  That is one of their logos.  It says RIP King.  It's one of

3    their fallen members, somebody of SG1700 that was killed.  And

4    then it says -- right under King, it says SG and then 1700.

5    Q.  And you said RIP King Lo.  Who was that?

6    A.  He went by Bolo.  That's where the Lo came from, but that

7    was Daniel Martinez.

8    Q.  And could you point out a photograph of him if I show you

9    the organizational chart in this case?

10   A.  Yes.

11          MS. MARTIN:  Your Honor, if I could have the witness

12   approach map.  The organizational chart is marked as 50-101,

13   and we have a blow up.

14          THE COURT:  You may.  Do you have a separate binder

15   for the Court or --

16          MS. MARTIN:  We passed up a flash drive, Your Honor.

17          THE COURT:  Oh, okay.

18          MS. MARTIN:  The exhibits are contained in those

19   binders.

20          THE COURT:  You have a flash drive?

21          MS. MARTIN:  Agent Rooney, are you going to be able to

22   see this?

23          THE WITNESS:  I can maybe move a little bit.  Yeah,

24   should be able to.

25          MS. MARTIN:  Your Honor, is there a place where

1   everyone can see this?

2          THE COURT:  You could put it in front of the jury and

3   he could come down if you want.

4          MS. MARTIN:  Okay.  May the witness approach, Your

5   Honor?

6          THE COURT:  Sure.  Put it right in front of the jury.

7   It could come down.

8   BY MS. MARTIN:

9   Q.  Agent Rooney, please go ahead and approach.

10  A.  Daniel Martinez is right here, AKA Bolo.

11  Q.  What is pictured in this exhibit?  And did you create this

12  exhibit?

13  A.  Yes, and it is the SG1700 minors.

14  Q.  Is this based on your investigation that you described

15  earlier?

16  A.  Yes, it is.

17  Q.  At this time, Agent Rooney, can you go ahead and go through

18  the individuals pictured on this chart and give us their

19  involvement in SG1700?

20         MR. PARKINSON:  Your Honor, is it possible to -- I

21  mean --

22         THE COURT:  Yeah, you could move.

23         MR. PARKINSON:  I'm sorry.  We have a copy of it, so.

24         THE COURT:  All right.

25         THE WITNESS:  May I proceed, Your Honor?

1          THE COURT:  Yes, you may.

2     A.  Obviously, right here is Kelvin Jimenez, AKA NIP.  AKA

3     obviously is their nickname.  That's going to come up a lot.

4     Do you want me to go through it?

5     BY MS. MARTIN:

6     Q.  Yes, please.

7     A.  Kelvin -- Kelvin Jimenez, obviously, you heard one of the

8     leaders of the gang -- drug sales, shootings.  He was also one

9     of the cooks.  So cocaine, when you get it, it has to be --

10    well, if you sell it as crack, you have to cook it.

11         MR. FITZPATRICK:  Objection.

12         THE COURT:  State your ground.

13         MR. FITZPATRICK:  Hearsay, Your Honor.  I thought he

14    was identifying the chart.

15         THE COURT:  Well, he was talking about how you cook

16    cocaine.  How the process of cooking cocaine.  So overruled, I

17    permit it.

18

19         THE WITNESS:  Obviously, since the process -- not

20    everyone knows how to do it.  So there are certain members that

21    you will hear --

22         MR. FITZPATRICK:  Your Honor, I'm going to object

23    again.  I cannot see the witness, so if he's going to be

24    allowed to testify like this --

25         THE WITNESS:  Is this good?

1          THE COURT:  Very well.  Can you see him now?

2          MR. FITZPATRICK:  Yes, Your Honor.

3          THE COURT:  All right.  Go ahead.

4          THE WITNESS:  So I was saying only a couple of the

5   members know how to cook it from cocaine to crack.  So he was

6   obviously -- obviously one of those.  Provided guns to the gang

7   and also the drugs and the sale of drugs as well.

8   Dominique Parker, AKA Dom, another leader of the gang, same

9   thing.  He actually knew how to cook it from cocaine to crack,

10  involved in shootings, the murders, and possession of firearms

11  as well.

12         Sherman Easterling as I just stated, he is one of the

13  cooperating codefendants.  He was one of the individuals that

14  was in the room of 1688 Bridge the day Sergeant O'Connor was

15  killed in the line of duty.  He's involved in shootings, drug

16  sales as well.

17         Khalif Sears -- I'm sorry.  Sherman Easterling, AKA

18  Foot.  Did I mention that?  Khalif Sears, AKA Leaf and Little

19  Leaf.  He was another one that was in the room, 1688 Bridge the

20  day of.  He was in one of the ones staying in the room because

21  he had an arrest warrant out for a murder, and that's the

22  murder of Tyrone Tyree.  He was one of the ones hiding out in

23  that room.  He's involved in shootings, murders, obviously, and

24  sold drugs for the gang as well.

25         Bilal Mitchell, AKA Walkdown, O, another one of the

1     members.  He was one of the enforcers for the gang.  He was a
2     cooperating codefendant in this case.  He's -- he's committed
3     murders, committed shootings, and sold drugs -- drugs for the
4     gang.
5              Hassan Elliott, another one of their enforcers.  He
6     was nicknamed AKA Haz.  Like I said, an enforcer.  He's
7     committed a lot of shootings, murders, sold drugs for them.
8     He's the other one that was wanted by the arrest warrant by
9     Philadelphia Police Department for the murder of Tyrone Tyree.
10    He was the other one that they were hiding out in there.
11    Jamal Williford, AKA Mack and Mal, he's another cooperator.
12    The jury will hear from.  He participated in the shootings.
13    Sold drugs for them as well, and considered a underboss.  He's
14    also the brother of Dominique Parker.
15             Samuel Martinez, AKA Bojo or Jojo.  It was Jojo.
16    Changed to Bojo because he's brothers with Daniel Martinez, and
17    he talked about who was killed in 2016.  And then he combined
18    Jojo and Bolo into Bojo.  He's involved in shootings and drug
19    selling as well.
20             Michael East (ph.), AKA Cousin Mike, another member of
21    the gang involved in shootings, drug sales.
22             Qiideem Willis, AKA Quaddy, Q -- he's one of the
23    original members.  He's more of the -- the Lesher -- Lesher
24    Street side, and one of the leaders on the Lesher street side.
25    Drug sales, all that.

1    Rasheed Muhammad (ph.), aka Rosh -- oh, Rasheed.  Rosh and

2    Rasheed.  He, along with Willis (indiscernible) are the Lesher

3    Street gang leaders.  Drug sales as well.

4         Jason Clark (ph.), AKA J-Rock (ph.) -- he was -- and

5    then his brother right next to him, Michael Clark (ph.), AKA

6    Tank.  They both sold drugs for the -- the gang SG1700.

7    Maximo Jimenez, AKA Max, is Kelvin Jimenez's brother.  He -- he

8    was involved in the drug sales as well.  He was also in the

9    shooting.  His car -- or his car -- a car or guns were

10   recovered was registered in his name.  You'll hear about that

11   more later.

12        Laquan Hayes, aka Papi.  He was -- well, he's an

13   SG1700 member.  Kind of considered an untouchable because he

14   did grow up in the Tackawanna Projects, so he kind of had ties

15   to both.  So he was really good friends with Dominique Parker.

16   Laquan Hayes was killed.  That was during the shooting of

17   Bernard Lee that Dominique Parker was involved in.

18   And Dave Foreman (ph.), White Boy Dave -- he sold drugs for the

19   gang SG1700.  Same thing with Amanda Durbin (ph.).  She sold --

20   she sold drugs for the gang.  We talked about Daniel Martinez.

21   Kelvin Selby (ph.), AKA Kev.  He was involved in shootings as

22   well.

23        Christopher Addison (ph.), AKA Jaja, Wop -- was

24   involved in some shootings that the jury will hear about as

25   well.

1    Jeffrey Santana (ph.), AKA Free -- he's one of the people that

2    was able to get the actual cocaine powder -- cocaine in bulk

3    that Kelvin Jimenez and Parker had to cook into crack.  So he's

4    one of the sources.

5         Malik Smith (ph.), aka Leak.  He was part of SG1700.

6    He was a rapper, kind of in the YouTube videos.  You see him a

7    lot as well -- or stills from the YouTube videos.  And you'll

8    see him.  He -- he got shot in August 2019 and when he got shot

9    in the territory it actually caused the retaliation shootings,

10   too, against both gangs in the next -- next five days.  They

11   retaliated against both because they weren't sure which one did

12   it.  And you'll hear about that.

13        Duran Koimeme, AKA Lil Ron -- he's deceased as well.

14   One of the first shootings we'll talk about, he committed.

15   And Malik Battle (ph.), AKA Streets.  One of the original

16   members involved in both sales and securing supply.

17   BY MS. MARTIN:

18   Q.   Thank you, Agent Rooney.  You can take a seat.  I'll leave

19   this up in case you need it.  Agent Rooney, you mentioned a

20   couple of different things when you were talking about like,

21   specifically Quadi or Rosh.  You mentioned that they're the

22   leaders of 5300 Lesher.  Can you explain to us the difference

23   between the 5300 Lesher side and the SG1700 side and the

24   different names that the entire gang goes by?

25   A.   Yeah.  So they'll -- they'll represent both names.  It was

1    originally on Lesher Street, and they kind of branched out.

2    It's the same gang.  It's just different streets that they

3    would sell on.

4    Q.  And again, going back to the photograph that's on the

5    screen.  That's one that shows Scattergood, but then it also

6    shows Lesher and Brill; is that right?

7    A.  At the top you'll see 5300 Lesher.  It says 1600 Brill

8    Street right underneath it.  And then the bottom picture says

9    1700 Scattergood.  So those are the streets that are all

10   walking distance that they would sell drugs on.

11   Q.  And what are the different names that the gang has gone by

12   over the years?

13   A.  5300 Lesher or L-Block, 1700 Scattergood or SG1700, and

14   they went also by Top Chef Boys, which TCB.  That was actually

15   in Kelvin Jimenez's Instagram.  That's what his tag name was --

16   username, if you will.  TCB, so that meant Top Chef Boy.  And

17   then they went by Pretty Boy Gang, PBG, and then also CTE which

18   was Can't Trust Everyone.

19   Q.  And the symbol that's on the righthand side, we sidetracked

20   with the RIP King Lo.  But that, again, all relates to the

21   murder of Daniel Martinez, AKA Bolo?

22   A.  Yes, in 2016.

23   Q.  And then the SG1700 in the middle there.  Is it fair to say

24   that the jury will see numerous photographs of individuals in

25   the gang wearing that clothing?

1   A.   Yes.

2   Q.   What about gangs --

3          THE COURT:  Do you think this is a good time to

4   conclude --

5          MS. MARTIN:  Sure.

6          THE COURT:  -- because I have to give the jury some --

7          MS. MARTIN:  Yes, Your Honor.

8          THE COURT:  -- remarks --

9          MS. MARTIN:   I apologize.  I didn't see what time it

10   was.

11          THE COURT:  -- and discuss my schedule.

12          So members of the jury, at this point --

13          Yeah, you could step down.

14          We're going to recess for the balance of the day.  I

15   think that we could start tomorrow at 9.  So we're going to

16   start tomorrow at 9 promptly.  I think one of the jurors was

17   gracious enough to make arrangements that she could be at 9.

18   And we're going to go Thursday and Friday this week.  We'll sit

19   on Friday to make up a little bit for the balance of the delays

20   in this trial.

21          Next week, I'm going to put out a schedule probably

22   tomorrow, including taking us through the first week in March

23   through Wednesday.  I have to make some adjustments for

24   Thursday and Friday.  Friday, we don't sit -- Friday, March

25   7th, we don't sit.

1          By Thursday, I have to make some adjustments.  So I

2    will get to the schedule for next week through Wednesday of

3    next week, and I will modify early next week.  But we're going

4    to put out a schedule for the balance of March that includes

5    the date that you're going to be sitting.  Just a couple of

6    days, that you're not going to sit in the middle of the week,

7    but we're going to do four days, and I'll put that schedule out

8    to you.

9          Normally I break at a -- in the morning, we break at

10   11 for a fifteen-minute break.  We generally take one hour for

11   lunch.  I'm bringing lunch, I think, on a daily basis to help

12   move things along.  So we may cut the lunch break a little bit,

13   up to forty-five minutes.  And we generally take a break at 3

14   o'clock for fifteen minutes.  And generally we go to 5 o'clock

15   and see how the case moves along.

16         But members of the jury, I'm going to repeat this

17   almost at every break because I must.  Make sure that you keep

18   an open mind until all the evidence is in, until you heard the

19   arguments of the lawyers, and you have an opportunity to have

20   the law and discuss the case in the jury room with a view of

21   reaching a verdict.  So please do not discuss the case among

22   yourselves until the end of the trial.

23         When you go back to the jury room to deliberate, you

24   need to allow each other the opportunity to keep an open mind

25   throughout the entire trial.  And of course, you may talk to

1    your fellow jurors about anything of a personal nature or of

2    common interest, but under no circumstances are you to talk

3    with the other jurors about the testimony that you've been

4    hearing during the course of the trial.

5            Until the trial is over and your verdict is announced,

6    do not watch or listen to any television or radio news programs

7    or reports about the case, or read anything on the news or

8    internet stories or articles about the case or anyone involved

9    with this case.  Do not use your electronic devices, including

10   your cell phones, while in the courtroom and during the

11   deliberations.  Again, we will collect those electronic devices

12   and then give them to you on the breaks so you could use them

13   for personal uses during the recess.  But please do not access

14   information or give information to anyone, and do not

15   communicate with anyone via phone, email, text or any blog,

16   website, online forum or internet chat room, or through any

17   social media site, including but not limited to Instagram,

18   Facebook, TikTok, X, Snapchat, WhatsApp, YouTube, and LinkedIn.

19   You may not obtain information or disclose information from any

20   source outside the courtroom using this technology.

21           Please follow these restrictions about all

22   communications about this case, even those that are not

23   directed at any particular person or group.  Remember what I

24   said earlier about communications in blog posts or Tweets.  Can

25   be shared by -- with these algorithms, it could be shared with

1    millions of people and can have unexpected consequences on the

2    trials.  For example, a person that's going to be testifying

3    could inadvertently read something that was happening in the

4    courtroom before she or her gives their courtroom testimony,

5    and that would be inappropriate.

6         And in any event, members of the jury, if something of

7    that nature happens, you report it to me immediately so I could

8    take appropriate steps to make sure that both the Government

9    and defense get a fair trial.  And remember not to conduct any

10   independent research of your own on any matters, legal issues,

11   individuals, entities.  This case, this type of case, or any

12   other issues involved with this case, or the people involved

13   with this case.  Do not consult dictionaries or reference

14   works, research the internet, websites, blogs for additional

15   information, or use a computer, cell phone, or other device or

16   any other method to obtain information to supplement your

17   knowledge about this case, the parties in this case, or anyone

18   involved in the case.  Do not try to find out any information

19   from any source outside the confines of this courtroom.

20        Again, at the end of the case, our security officer

21   will direct you in and out of the building and give you

22   instructions as to where to meet tomorrow.  To begin the trial

23   promptly at 9 a.m.  I need you at 9 a.m.  We got to compensate

24   for the time we lost.  And members of the jury, with those

25   instructions, I direct you to have a nice evening, I guess.

1    Get home safely.  Get home safely, so drive carefully or watch

2    out for crazy drivers on the road.  And I'll see you tomorrow

3    promptly at 9 a.m., so you may follow my deputy.

4              THE COURT OFFICER:  All rise.

5         (Jury exits)

6              THE COURT:  All right.  Very quickly, I'll put a note

7    on one of the jurors, Alternate No. 16 -- it's Juror No. 16 --

8    gave me a note because if he remembers the question from Monday

9    regarding during jury selection, which he forgot to let us know

10   that his native language is not English.  However, he also

11   wanted to let us know that he has been communicating in English

12   for the last fifty years.  But his native language is Nepali.

13   Regret and sorry if any inconvenience caused.  Thank you.  In

14   other words, he's trying to let us know that he forgot

15   something, but he's a fluent English speaker.  He doesn't have

16   a problem understanding, but I'll place that on the record.

17             MR. PARKINSON:  Very good.

18             THE COURT:  All right.  Thank you very much.

19             MR. PARKINSON:  Your Honor, (indiscernible) --

20             MS. MARTIN:  Your Honor --

21             MR. PARKINSON:  Your Honor, may I (indiscernible) --

22             THE COURT:  All right.  Is there something we could

23   deal with tomorrow?  We could deal with it tomorrow morning.

24   I'm here at 8:30, so I could see you before we begin at 9

25   o'clock.  I want to start at 9 o'clock promptly.  So how much

1    time is this issue that you're raising is going to take?

2            MR. PARKINSON:  Three minutes, Judge --

3            THE COURT:  All right.

4            MR. PARKINSON:  -- if they agree.  Three minutes if

5    they agree.  (Indiscernible).

6            THE COURT:  And if they don't agree?

7            MR. PARKINSON:  It can take all day if we're fighting.

8            THE COURT:  Okay.  We're not going to take all day.

9    We're going to take less than three minutes.  Discuss the issue

10   with each other and then be prepared to address it.  I'm going

11   to be here at 8:30, so we'll start fifteen minutes before 9.

12   But I want to start at 9 and catch up in this case.  We will go

13   tomorrow till 5.  And we are convening on Friday and we'll go

14   to 5 as well.  So have a nice evening.

15           MS. MARTIN:  Thank you.

16           MS. STRAM:  Thank you.

17           THE COURT OFFICER:  All rise.

18           THE COURT:  Yes.  The exhibits.  I thought I was

19   supposed to have a hard copy of the exhibits.

20           MS. MARTIN:  Your Honor, it was my understanding that

21   you agreed to the one hard copy here in the courtroom.

22           THE COURT:  You want me to look at the transcript?

23           MS. MARTIN:  Yes, we can.  And that there would then

24   be an electronic copy provided to you, and I did provide it to

25   the Court on a flash drive --

 1          THE COURT:  All right.

 2          MS. MARTIN:  -- along with the exhibit list.

 3          THE COURT:  All right.  So we need a lot from my

 4   laptop?

 5          MS. MARTIN:  Your Honor, we had the whole conversation

 6   by getting a second laptop from Court Services for you.

 7          THE COURT:  Yeah.

 8          THE CLERK:  Sorry.  I thought that he would have

 9   access to one hard copy and then I would just have the USB.

10   That was our understanding.

11          THE COURT:  Yeah.

12          THE CLERK:  Is that possible?  Is it possible for him

13   to have a hard copy, like to follow along?

14          MS. MARTIN:  Yes.  That part is the entirety of the

15   exhibit.  That's one set of exhibits.

16          THE COURT:  All right.  But you're going to be using

17   that exhibit?  Are you going to be using those hard copies?

18          MS. MARTIN:  We don't intend to, Your Honor, unless

19   there's some sort of emergency.  If we can keep it, we can

20   always go to sidebar and ask you to pull the paper copy if we

21   needed something from it.

22          THE COURT:  All right.  Could we put on this -- can we

23   put that card here and change --

24          MS. STRAM:  Sure.

25          MS. MARTIN:  Yes, of course.

1                THE COURT:  And we could do that tomorrow morning.

2                Jamie, yeah.  Take that, move it someplace else and

3     put that card here.  We'll all have access to it.

4                MS. MARTIN:  Yes, that works.

5                THE COURT:  But I want to -- I want the hard copy.

6     I'm old school.  I'm not tech -- you know.  But I'm getting

7     there.  All right.  Thank you.

8                MR. DIVINY:  Thanks, Judge.

9                MS. MARTIN:  Thank you, Your Honor.

10                MR. DIVINY:  Have a good night.

11                THE COURT OFFICER:  All rise.

12                (Proceedings concluded at 5:06 o'clock, p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T I O N

2

3          I, Sophia Long, court-approved transcriber, do hereby

4   certify the foregoing is a true and correct transcript from the

5   official electronic sound recording of the proceedings in the

6   above-entitled matter.

7

8

9   _____          May 16, 2025

10
    Sophia Long                       _____
11                                    DATE

12

13

14

15

16

17

18

19

20

21

22

23

24

25